# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

―――――――――――

Nº 06 Civ. 3410 (RJS)

―――――――――――

## IN RE PXRE GROUP, LTD., SECURITIES LITIGATION

―――――――――――

OPINION AND ORDER
March 4, 2009

―――――――――――

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiff Chad S. Condra ("Plaintiff") brings this putative class action lawsuit against Defendants PXRE Group, Ltd. ("PXRE" or the "Company"), a Bermuda reinsurance corporation, and three of its officers, Jeffrey L. Radke ("Radke"), John M. Modin ("Modin"), and Guy Hengesbaugh ("Hengesbaugh").[1]   Plaintiff alleges that Defendants engaged in a scheme to understate PXRE's losses arising out of the series of hurricanes that devastated the Gulf Coast in 2005.  Plaintiff asserts that this scheme caused injury to himself and to all other purchasers of PXRE stock during the period from September 11, 2005 through February 22, 2006 (the "Class Period"), in violation of

section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Before the Court are Defendants' motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiff's motion to amend pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure.  For the reasons that follow, Defendants' motions are granted and Plaintiff's motion is denied.

―――――――――――

[1]  The Court will utilize the term "Defendants" to refer to all of the Defendants collectively, and the term "individual Defendants" to refer only to Radke, Modin, and Hengesbaugh.

I. BACKGROUND

A. Facts

The following facts are taken from the Proposed Second Consolidated Amended Class Action Complaint ("PSAC") submitted by Plaintiff.[2]  The Court also considers any written instrument attached to the PSAC, statements or documents incorporated into the PSAC by reference, legally required public disclosure documents filed with the Securities and Exchange Commission, and documents upon which Plaintiff relied in bringing the suit.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court assumes all alleged facts to be true for the purpose of deciding the motions before it, and construes all alleged facts in the light most favorable to Plaintiff.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).

1. The Parties

Plaintiff purchased shares of PXRE stock during the Class Period, and brings this putative federal class action lawsuit on behalf of all purchasers of PXRE common stock during the Class Period.  (PSAC ¶¶ 1, 16.)  Plaintiff asserts claims against PXRE and the three individual Defendants, all of whom were officers of PXRE during the time period relevant to this action.  (*Id.* ¶¶ 18-20.)

Defendant PXRE was a Bermuda corporation whose stock was publicly traded on the New York Stock Exchange.  (*Id.* ¶¶ 14, 17.)  PXRE is a reinsurance company, or an "insurer's insurer," providing insurance coverage both to primary insurers and to other reinsurance companies.  (*Id.* ¶¶ 17, 27.)[3]  PXRE provides reinsurance coverage to other property insurance companies (known as "cedents") that have sold policies to homeowners and businesses. (*Id.* ¶ 27.)  By so doing, PXRE assumes the contractual obligations set forth in the cedents' underlying policies, and is bound to cover claims arising from losses occurring under those policies.  (*Id.* ¶¶ 27-28.)  Since 1987, PXRE has specialized in offering catastrophe and "risk excess" reinsurance related to, among other events, hurricanes.  (*Id.* ¶¶ 17, 27.)

As noted, the three individual Defendants were all officers of PXRE during the relevant time period.  Individual Defendant Radke was PXRE's President and Chief Executive Officer.  (*Id.* ¶ 18.)  Individual Defendant Modin was PXRE's Executive Vice President and Chief Financial Officer prior to his resignation on January 6, 2006.  (*Id.* ¶ 19.)  Individual Defendant Hengesbaugh was PXRE's Chief Operating Officer.  (*Id.* ¶ 20.)  Further, all of the individual Defendants were members of PXRE's "Ceded Reinsurance Underwriting Committee," which was allegedly responsible for "[a]ll underwriting decisions." (*Id.* ¶ 22.)

2. The Alleged Scheme

Beginning in August 2005, a series of hurricanes landed on the Gulf Coast.  The first, and most devastating, was Hurricane Katrina, which hit the Gulf Coast on August 29, 2005, causing extensive and unprecedented damage to the city of New Orleans and the surrounding region. (*See id.*

---

[2]  *See infra* Part III.A.1 (discussing the Court's reliance on the PSAC).

[3]  The insurance policies that one reinsurer buys from another reinsurer to spread more widely the risk are called "retrocessional" insurance policies.  (PSAC ¶ 27.)

¶¶ 32-33.)  Much of the damage was caused by the fact that Hurricane Katrina resulted in a "storm surge," which overtopped the levees designed to protect New Orleans, culminating in the flooding of water from the Mississippi River into the city of New Orleans.  (*Id.* ¶ 33.)  As a result of the broken levees, river water submerged over eighty percent of New Orleans.  (*Id.*)  More than 1,800 people lost their lives in the wake of the storm, making Hurricane Katrina the deadliest United States hurricane since 1928.  (*Id.* ¶ 32.)

Soon after, on September 24, 2005, Hurricane Rita arrived, "causing billions of dollars in damages along the Texas-Louisiana border."  (*Id.* ¶ 34.)  Finally, on October 23, 2005, Hurricane Wilma struck the Gulf of Mexico, killing at least sixty-three people and causing billions of dollars in damages to affected areas, including the Gulf Coast.  (*Id.*)  Through its reinsurance policies, PXRE "had exposure" for all three storms, with Hurricane Katrina providing the "largest exposure."  (*Id.* ¶ 35.)

According to Plaintiff, PXRE, as a reinsurance company, was obligated to estimate losses arising from claims covered by its cedents' policies once any catastrophic event like Hurricane Katrina occurred.  (*Id.* ¶ 29.)  These loss estimates had to be prepared "even before actual claims were filed and processed."  (*Id.*)  Plaintiff asserts that such loss estimates were "closely watched" by rating agencies such as A.M. Best and Standard & Poor's, which issue ratings based on evaluations of whether a company has sufficient capital relative to potential claims and liabilities to support the sale of new policies.  (*Id.* ¶ 30.)  Plaintiff claims that "it was imperative that PXRE maintain a rating of A- or higher from the insurance rating agencies," because if PXRE's rating fell

below A-, cedents were contractually bound not to purchase reinsurance policies from PXRE, and were also contractually entitled to cancel their reinsurance policies with PXRE.  (*Id.* ¶ 31.)  In other words, "[a]ny downgrades below A- would essentially put [PXRE] out of business."  (*Id.* ¶ 75.)

Plaintiff further alleges that, "[a]t the outset of the Class Period, PXRE was especially vulnerable to a ratings downgrade," due to the exhaustion of PXRE's own retrocessional insurance policies[4] and due to the fact that PXRE's capital surplus was low relative to the initial estimates of the losses incurred by Hurricane Katrina.  (*Id.* ¶¶ 74, 76.)  "If PXRE's reported loss estimates from Katrina were too high relative to its capital surplus, [its] ability to pay claims would be deemed at risk, likely resulting in a ratings downgrade."  (*Id.* ¶ 75.)

Plaintiff posits that because of this pressure to maintain an A- credit rating and to raise capital, "Defendants were motivated to materially understate PXRE's estimate of losses, as well as engage in a string of offerings to raise cash, which they did throughout the Class Period."  (*Id.* ¶ 77.)  In essence, Plaintiff alleges that the loss estimate reports created by PXRE in the wake of the three hurricanes that hit the Gulf Coast in 2005 were prepared in a reckless and/or willfully deceptive manner; that, as a result, the loss estimates issued in a series of press releases and public documents were false and misleading; and that Defendants disseminated these false and misleading reports with the intention of deceiving insurance rating agencies and investors as to the true extent of PXRE's losses arising from the three hurricanes.

---

[4]  *See supra* note 3.

Below, the Court details the factual allegations from the PSAC involving (1) the preparation of the loss estimate reports, and (2) the allegedly false and misleading statements issued during the Class Period.

### i. The Preparation of the Loss Estimate Reports

Based on information allegedly provided by confidential informant ("CI") #2, PXRE's Vice President in charge of risk modeling,[5] Plaintiff alleges that PXRE's loss estimate reports were prepared by a team consisting of Radke, Hengesbaugh, Modin, and James Matusiak ("Matusiak"), PXRE's "Chief Actuary." (*Id.* ¶ 40.) Plaintiff further alleges that the losses were estimated on the basis of (1) "top down" computer modeling, whereby PXRE used software designed by outside risk modelers, as well as its own "proprietary software," to generate an estimate of PXRE's losses in relation to industry-wide losses; and (2) a "ground-up" contract-by-contract analysis of reinsurance contracts held by PXRE, whereby its underwriters would examine PXRE's own contracts in order to determine the extent of PXRE's exposure to losses. (*Id.* ¶ 41.) According to CI #2, individual Defendants Radke and Hengesbaugh allegedly "had the most influence over the final loss estimate figures and had the final say on the estimates that were disseminated to the public." (*Id.* ¶ 40.)

### a. PXRE's "Top-Down" Modeling

In regard to the "top-down" analysis conducted by PXRE following Hurricane Katrina, Plaintiff asserts that PXRE's estimates "were based in part on industry-wide projections of $30-$40 billion of insured

losses arising from the Katrina catastrophe." (*Id.* ¶ 93.) However, Plaintiff alleges that in utilizing this industry-wide loss projection, Defendants "ignored the much higher estimates [of $40 billion to $60 billion in losses] published by [one modeling agency called Risk Management Solutions, Inc. ('RMS')] . . . a well-respected catastrophe modeler." (*Id.*) According to the PSAC, RMS allegedly included in its industry-wide loss projections "a significant amount of damages from commercial and covered residential flooding in New Orleans." (*Id.*)[6] Specifically, RMS estimated that "*river flooding in New Orleans*" was likely to result in $15 billion to $25 billion of those losses. (*Id.* ¶ 37 (emphasis in original).)

The PSAC does *not* specifically allege that PXRE's computer modeling system failed to account for commercial flooding in New Orleans. However, Plaintiff does assert, on the basis of information purportedly obtained from CI #2, that PXRE's "modeling system" had two specific flaws. (*See id.* ¶¶ 43-44.) First, Plaintiff claims that PXRE's proprietary software, as well as the software previously purchased by PXRE from outside risk modelers, was only capable of calculating losses due to *ocean* flooding, and was incapable of calculating losses incurred by *river* flooding. (*Id.* ¶ 43.) Second, Plaintiff asserts that PXRE's loss modeling system

---

[5] *See infra* Part III.A.2 (describing CI #2 in full).

[6] Commercial property insurance contracts may cover damages for flooding. (PSAC ¶ 38.) Most residential property insurance contracts *do not* cover damages for flooding. (*Id.*) However, even if residential or commercial property owners lack coverage for flooding, both may purchase additional flood insurance. (*Id.*) Plaintiff refers to "covered residential flooding" to signify homeowners who purchased this additional flood insurance. (*Id.*)

was "unreliable once loss estimates [arising from a storm] exceeded $35 billion, since the hurricanes [below] that threshold were fundamentally different from Katrina's trajectory and thus not predictive of the storm." (*Id.* ¶ 44.) Plaintiff alleges that this second flaw "effectively capped PXRE's estimate of industry losses at the $35 billion range." (*Id.*)

### b.  PXRE's "Ground-Up" Contract-By-Contract Analysis

In regard to PXRE's "ground-up" contract-by-contract analysis following Hurricane Katrina, Plaintiff alleges that, according to CI #2, PXRE's underwriters calculated loss estimates for each contract and reported those estimates to either Hengesbaugh, Radke, and/or Modin at both informal and formal meetings held in PXRE's Bermuda office. (*Id.* ¶ 42.) Plaintiff alleges that, although CI #2 neither participated in nor was "present" at these meetings, he "often heard the discussions that occurred" because the Bermuda office had an open floor plan and CI #2's desk was "right near the location of the meetings." (*Id.*) Based on CI #2's knowledge of these meetings, Plaintiff asserts that individual Defendants "Radke and Hengesbaugh exerted the most influence over the determination of the loss estimates." (*Id.*)

In addition, Plaintiff asserts that the "ground-up" contract-by-contract analysis conducted by PXRE failed to correct one of the flaws in PXRE's "top-down" modeling system — namely, the alleged lack of consideration given to PXRE's losses arising from "river flooding" in New Orleans. (*Id.* ¶ 45.) Therefore, although CI #2 "fully anticipated that significant upward adjustments would be made" to the "top-down" loss estimates prepared by PXRE's

underwriters, the publicly available loss estimates "'closely matched the reports'" prepared by the top-down modeling system. (*Id.* (quoting CI #2).)

Plaintiff alleges that the defects in both PXRE's "ground-up" and "top-down" loss estimate reports were responsible for PXRE's inability "to account for the $15-$25 billion of industry wide commercial (and covered residential) flooding losses triggered by the breached levees in New Orleans." (*Id.* ¶ 46.)

### ii.  The Allegedly False and Misleading Statements Issued During the Class Period

During the Class Period, Plaintiff alleges that PXRE, relying on its loss estimate reports, made several false statements before and after engaging in a string of offerings to raise cash.

### a.  The September 11, 2005 Press Release

On September 11, 2005, within two weeks of Hurricane Katrina's arrival on the Gulf Coast, PXRE issued a press release (the "September 11 release") indicating that its preliminary estimate of net losses[7] arising from Hurricane Katrina was approximately $235 million, and that PXRE calculated this estimate, at least in part, on the basis of industry-wide loss estimates of $30 billion to $35 billion. (*Id.* ¶ 47.) According to the PSAC, PXRE stated that it expected to report a net operating loss of $85 million to $100

---

[7]  The PSAC defines "net loss" as "the Company's coverage obligations after adjustments for tax, reinsurance recoveries on its outwards reinsurance program and the impact of inwards and outwards reinstatement and additional premiums." (PSAC ¶ 47 n.2.)

million for 2005. (*Id.* ¶ 48.)[8] PXRE indicated in the September 11 release that it calculated the preliminary estimate of its net loss from Hurricane Katrina on the basis of "extensive modeling, a ground-up review of all exposed reinsurance contracts and numerous discussions with PXRE's clients." (*Id.* ¶ 50.) Also in the September 11 release, individual Defendant Radke was quoted as stating, in relevant part, "[w]e expect that the unprecedented industry losses arising from Hurricane Katrina . . . are likely to have a significant impact on reinsurance pricing, . . . and we believe that we are well positioned to take advantage of the opportunities that are likely to present themselves in the wake of Hurricane Katrina." (*Id.* ¶ 49.)

The September 11 release also included the following cautionary language that was not quoted in the PSAC:

> It is difficult . . . to accurately estimate losses in the immediate aftermath of any major catastrophe. The unique circumstances of Hurricane Katrina, including the unprecedented flooding, limited access by claims adjustors and the potential legal and regulatory issues, add even more uncertainty to the normal difficulties of estimating catastrophe losses. PXRE will continue to monitor the situation and provide updates if its current estimate changes materially.

(Anderson Aff. Ex. C (the September 11 release); *see* PSAC ¶¶ 49-50 (quoting the September 11 release).)[9]

Plaintiff alleges that, as a result of Defendants' statements, the insurance rating agency A.M. Best gave PXRE a rating of "A" with "negative implications." (PSAC ¶ 52.) Plaintiff also claims that PXRE announced on September 15, 2005, "a shelf registration of up to $300,000,000 of debt securities, common shares, preferred shares, depositary shares, warrants, and trust preferred securities." (*Id.* ¶ 53.)

b. The September 19, 2005 Press Release

On September 19, 2005, PXRE issued a second press release (the "September 19 release"), updating its preliminary loss estimates for Hurricane Katrina. (*Id.* ¶ 54.) This new loss adjustment was based in part on a revised estimate of industry-wide losses of $30 billion to $40 billion, an increase from the previous industry-wide loss estimate of $30 billion to $35 billion. (*Id.* ¶ 55.) The

---

[8] The Court notes that the PSAC makes use of at least three distinct preliminary estimates of "net loss" figures: (1) the net loss directly incurred as a result of one or more of the three hurricanes; (2) the net loss for the third quarter of 2005; and (3) the net loss for the entire year 2005.

[9] The Court takes judicial notice of the entirety of the press releases issued by PXRE on September 11, 2005, September 19, 2005, September 28, 2005, and October 27, 2005, on the ground that each is partially quoted in the PSAC, and "integral" to Plaintiff's claims. *See, e.g.*, *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991). Further, there is no dispute regarding the authenticity, accuracy, or relevance of these press releases. *Cf. Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (noting that consideration of materials outside the complaint is permissible on a 12(b)(6) motion if the documents are integral to the complaint, it is clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and the relevance of the document is undisputed).

updated loss estimates also indicated that PXRE would suffer a net loss from Hurricane Katrina in the range of $235 million to $300 million, resulting in an expected net operating loss of up to $165 million for 2005. (*Id.* ¶ 54.)[10]

As with the September 11 release, the September 19 release indicated that the updated preliminary estimate was "based on extensive modeling, a ground-up review of all exposed reinsurance contracts and numerous discussions with PXRE's clients." (*Id.* ¶ 56.)

The September 19 release also included cautionary language similar to the language found in the September 11 release:

> It is difficult . . . to accurately estimate losses in the immediate aftermath of any major catastrophe. Moreover, the unique circumstances of Hurricane Katrina, including the unprecedented level of flooding and limited access by claims adjustors, make our estimates subject to a higher level of uncertainty than normal. In addition, further uncertainty is created by potential legal and regulatory issues . . . . To date, the Company has only received a limited number of written loss notices. PXRE will continue to monitor the situation and provide additional updates as necessary.

---

[10] Specifically, according to the September 19 release, PXRE announced that it expected to incur a net operating loss within the range of $85 million to $165 million for 2005. (Anderson Aff. Ex. D (the September 19 release); *see* PSAC ¶ 56 (quoting the September 19 release).)

(Anderson Aff. Ex. D (the September 19 release); *see* PSAC ¶ 56 (quoting the September 19 release).)

On September 23, 2005, A.M. Best issued a report regarding PXRE, indicating that:

> Further catastrophe losses in the short term may expedite A.M. Best's review and potentially result in a ratings downgrade. A.M. Best will continue to hold discussions with PXRE's management in order to assess the company's risk management capabilities and to reevaluate the level of capital necessary to support PXRE's profile.

(PSAC ¶ 58.)

c. The September 28, 2005 Press Release

Hurricane Rita made landfall on September 24, 2005. (*Id.* ¶ 59.) On September 28, 2005, PXRE issued a third press release (the "September 28 release"), indicating that its preliminary estimate of net losses arising from Hurricane Rita was in the range of $30 million to $40 million. (*Id.*) This raised PXRE's total expected net loss for the third quarter to the range of $230 million to $320 million. (*Id.*) PXRE also stated that it expected to report a net operating loss of $125 million to $200 million for 2005. (*Id.*)

Like the two earlier press releases, the September 28 release contained language explaining PXRE's reliance on "modeling and a review of all exposed reinsurance contracts" (*id.* ¶ 60), as well as cautionary language warning, *inter alia*, that "the ultimate impact of losses from Hurricane Katrina and Hurricane Rita on the Company's results of operations might . . . differ substantially from

the Company's current estimates." (Anderson Aff. Ex. E (the September 28 release); *see* PSAC ¶ 60 (quoting the September 28 release).)

In response to these increased estimates, on September 30, 2005, A.M. Best and Standard & Poor's downgraded PXRE to a rating of "A-" with "negative implications." (PSAC ¶ 62.) On that same day, Defendants announced that PXRE intended to make a public offering of approximately $100 million of its common shares, and that it had agreed to sell $375 million of its series D perpetual preferred shares in a private placement. (*Id.* ¶ 63.) PXRE announced that it had completed both of these sales on October 7, 2005. (*Id.* ¶ 64.)

d. The October 17, 2005 Proxy Statement

On October 17, 2005, PXRE filed a Proxy Statement (the "October 17 Proxy Statement") calling for a Special General Meeting of Shareholders, at which it would seek shareholder approval of a proposal to convert the perpetual D shares recently offered by PXRE into regular common stock. (*Id.* ¶ 65.) The October 17 Proxy Statement also reiterated some of the statements made in the September 19 release. (*See id.* ¶¶ 65-66.) Specifically, it stated that on September 19, 2005, PXRE had increased its earlier loss estimates due to the net impact of Hurricane Katrina to the range of $235 million to $300 million. (*Id.* ¶ 65.) The October 17 Proxy Statement also noted that "losses from Hurricane Katrina will materially negatively impact third quarter financial results and shareholders' equity and PXRE Group expects to have a net loss for calendar 2005." (*Id.*) As with the previous press releases, the October 17 Proxy Statement also noted that the "estimates were based mainly on

modeling, a review of exposed reinsurance contracts and discussions with certain clients." (*Id.* ¶ 66.)

e. The October 27, 2005 Press Release

On October 27, 2005, PXRE issued a fourth press release (the "October 27 release"), announcing results for the third quarter ending September 30, 2005. (*Id.* ¶ 68.) This announcement included revised loss estimates for Hurricane Katrina and Hurricane Rita. (*Id.*) Specifically, PXRE announced that the Company incurred net losses of approximately $349.9 million from the storms. (*Id.*) Of those losses, $330 million was attributable to Hurricane Katrina. (*Id.*) This raised PXRE's total expected net losses to $317.3[11] million. (*Id.*)[12]

In the October 27 release, individual Defendant Radke was quoted as saying:

> Hurricanes Katrina and Rita will make the third quarter of 2005 the most costly quarter in history for the reinsurance industry in terms of insured catastrophe loss. PXRE's loss for the quarter is correspondingly large but the storms again demonstrated the strength of PXRE's risk management, as our losses were

---

[11] In the PSAC, Plaintiff alleges that PXRE raised its expected net loss to $317.3 million. (PSAC ¶ 17.) However, the October 27 release indicates that the amount was $317.*4* million. (*See* Anderson Aff. Ex. H (the October 27 release); *see* PSAC ¶ 69 (quoting the October 27 release).)

[12] Although the PSAC is not specific, the October 27 release itself makes clear that the $317.4 million figure refers to an estimate of net losses for the third quarter 2005. (*See* Anderson Aff. Ex. H (the October 27 release); *see* PSAC ¶ 69 (quoting the October 27 release).)

8

within our expectations for such major events. . . . . The strategic market position we have earned over the past 23 years through our dedication to customer service and prompt claims payment gives us confidence in our ability to thrive in the wake of Hurricanes Katrina and Rita, and recent feedback from communications with brokers validates that confidence. Indeed, our recent success in raising $474 million of equity capital reflects investors' belief in the strength of PXRE's franchise, which flows from our focused strategy and proven risk management.

(Anderson Aff. Ex. H (the October 27 release); *see* PSAC ¶ 69 (quoting the October 27 release).)

The October 27 release also stated that "[g]iven the current uncertainty of the net impact of Hurricane Wilma on the Company's fourth quarter results, PXRE has withdrawn its previously disclosed guidance for the year and will not be providing revised guidance for 2005 at this time." (Anderson Aff. Ex. H (the October 27 release).)

#### f. The Form 10-Q

On October 28, 2005, PXRE filed its quarterly report on Form 10-Q with the Securities and Exchange Commission (the "Form" or the "Form 10-Q"). (PSAC ¶ 70.)[13]

---

[13]  The Court takes judicial notice of the entire Form 10-Q. (*See* Anderson Aff. Ex. B (the Form 10-Q).) In considering a motion to dismiss under Rule 12(b)(6), the Court may take judicial notice of "any statements or documents incorporated in [the complaint] by reference, as well as public disclosure documents required by law to be, and that have been, filed with the

Plaintiff characterizes this Form as "reaffirm[ing] the Company's previously announced financial results." (*Id.*) Plaintiff also quotes Defendants as making the following statement in the Form 10-Q: "Accordingly, our estimates of the ultimate liability for gross loss . . . arising from Hurricanes Katrina and Rita of $577.2 million is based mainly on modeling, a review of exposed reinsurance contracts and discussions with numerous clients." (*Id.*)[14]

The Form 10-Q also contained the following language, not quoted by Plaintiff in the PSAC:

[I]n establishing our best estimate of liability for loss and loss expenses relating to Hurricanes Katrina and Rita, we have made several complex and subjective assumptions and judgments. For example, we have assumed that the industry-wide insured loses from Hurricane Katrina

---

SEC . . . ." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)). Here, the Form 10-Q is indisputably a "public disclosure document[] required by law to be . . . filed with the SEC . . . ." *Id.* Moreover, the PSAC incorporates the Form 10-Q by quoting certain portions thereof (*see* PSAC ¶ 70), and consideration of the "full text" of the Form 10-Q is appropriate because the document is "integral" to the claims set forth in the PSAC. *See supra* note 9 (providing support for this proposition of law). Further, there is no dispute regarding the authenticity, accuracy, or relevance of the Form 10-Q. *See id.*

[14]  The Court notes that the $577.2 million figure quoted from the Form 10-Q refers to PXRE's estimate of *gross* losses. (*See* Anderson Aff. Ex. B (the Form 10-Q) at 36; *see* PSAC ¶ 70 (quoting the Form 10-Q).) The figures released in PXRE's press releases, as noted, refer to PXRE's estimate of *net* losses. Although Plaintiff defines net loss in the PSAC, *see supra* note 7, Plaintiff fails to define gross loss.

will be approximately $30.0 billion to $40.0 billion, and those from Hurricane Rita will be approximately $2.5 billion to $6.0 billion. A variety of industry sources have published estimates for these events. AIR Worldwide and Risk Management Solutions are two of the leading firms that develop and sell probabilistic catastrophe modeling technology. AIR Worldwide has estimated that industry-wide insured losses for Katrina will be approximately $34.0 billion and for Rita will be approximately $4.0 billion to $5.5 billion. Risk Management Solutions have estimated industry-wide insured losses are approximately $40.0 billion to $60.0 billion for Hurricane Katrina and $3.0 billion to $5.0 billion for Hurricane Rita. Lastly, ISO's Property Claim Services unit has estimated that insured losses for Hurricane Katrina will be approximately $34.4 billion.

(Anderson Aff. Ex. B (the Form 10-Q) at 37; *see* PSAC ¶ 70 (quoting the Form 10-Q).)[15]

---

[15]  On November 9, 2005, PXRE issued a fourth press release (the "November 9 release"), indicating that its preliminary estimate of net losses arising from Hurricane Wilma was between $75 million and $90 million, and that PXRE calculated this estimate based in part on industry-wide loss estimates of $14.5 billion for Hurricane Wilma. (*See* PSAC ¶ 72.) PXRE also indicated in the November 9 release that it incurred an estimated $425 million to $440 million in total losses from all three hurricanes. (*Id.*) Plaintiff does not allege that the statements contained in the November 9 release are false and misleading, as he does for the September 11 release, the September 19 release, the September 28 release, the October 17 Proxy Statement, the October 27 release, and the Form 10-Q. (*See id.* ¶¶ 51, 57, 61, 67, 71.)

On November 23, 2005, PXRE announced that it had filed a shelf registration statement for a proposed offering of up to $700 million of its securities. (PSAC ¶ 73.)

### 3. PXRE's Subsequent Disclosure of the Full Extent of its Losses

Plaintiff alleges that, according to CI #2, "prior to January 2006," PXRE began to receive loss notices from its cedents indicating that PXRE's loss estimates for Hurricane Katrina were "far too low." (*Id.* ¶ 91.) Additionally, Plaintiff alleges that CI #2 "recalls that 'by January, we were assembling year-end numbers . . . and there was anxiety at the company [because] the numbers were bigger than reported.'" (*Id.* (quoting CI #2) (alterations in original).) Plaintiff also alleges that "the cause of the increase in losses stemmed in large part from the Company's exclusion of river flooding from New Orleans." (*Id.*)

On February 16, 2006, PXRE issued a press release (the "February 16 release"), partially disclosing the full extent of its losses from Hurricanes Katrina, Rita, and Wilma. (*Id.* ¶ 103.) Specifically, PXRE raised its loss estimates for all three storms to the range of $758 million to $788 million, up from the range of $425 million to $440 million. (*Id.*) PXRE also reported a net loss of $446.5 million. (*Id.* ¶ 104.) As a result of these disclosures, A.M. Best immediately downgraded PXRE's rating to B++. (*Id.* ¶ 105.) On February 17, 2006, PXRE shares fell 66% "on extraordinarily high trading volume." (*Id.* ¶ 106.) On February 20, 2006, Standard & Poor's downgraded PXRE's debt to BBB+. (*Id.* ¶ 107.)

On February 22, 2006, PXRE raised its loss estimates for Hurricanes Katrina, Rita,

and Wilma to $807 million, and announced that, as a result of these losses, it had an accumulated deficit of $527.3 million. (*Id.* ¶¶ 108, 110.) In a teleconference with analysts the same day, individual Defendant Radke "identified 'un-modeled commercial flood damages' as a reason for the increased estimates." (*Id.* ¶ 109.) Following this news, A.M. Best downgraded PXRE's credit rating to B+ and Standard & Poor's downgraded PXRE to BBB-. (*Id.* ¶ 111.) PXRE shares again fell, this time by 6%, "on extraordinarily high trading volume." (*Id.* ¶ 112.)

On April 11, 2006, PXRE announced that it had requested that the major credit rating agencies withdraw their ratings for PXRE and its operating subsidiaries. (*Id.* ¶ 113.) On April 18, 2006, individual Defendant Hengesbaugh left PXRE, "triggering the golden parachute he negotiated in December, 2005." (*Id.* ¶ 114.)

By August 8, 2006, PXRE announced that it had ceased writing new policies, and that 82% of its contracts had been canceled by clients as a result of its rating downgrade below A-. (*Id.* ¶ 115.) On May 8, 2007, PXRE announced that it would be merging with Argonaut Group. (*Id.* ¶ 116.) On August 7, 2007, PXRE merged with Argonaut Group, and the combined entities now conduct business as Argo Group International Holdings, Ltd. (*Id.* ¶ 17 n.1.)

B. Procedural History

The initial Complaint against Defendants was filed on May 3, 2006.[16] Thereafter, three additional putative class action lawsuits were filed in this District.[17] On May 15, 2006, the initial case was reassigned from the Honorable Shirley Wohl Kram, District Judge, to the Honorable Kenneth M. Karas, District Judge. By Order dated March 30, 2007, Judge Karas appointed Chad S. Condra as lead plaintiff, appointed Condra's counsel as lead counsel, and consolidated these cases under the caption "In re PXRE Group, Ltd. Securities Litigation." On September 4, 2007, the case was reassigned to the undersigned.

On June 15, 2007, Plaintiff filed the Consolidated Amended Class Action Complaint ("CAC"). Defendants filed their motion to dismiss and a memorandum in support of that motion on August 15, 2007 ("Defs.' Mem."). Individual Defendant Hengesbaugh filed a separate memorandum in support of his own motion to dismiss on September 12, 2007 ("Hengesbaugh Mem."). On October 15, 2007, Plaintiff submitted the PSAC and filed a cross-motion to amend the CAC, as well as a memorandum in support of his motion to amend and in opposition to Defendants' motions to dismiss ("Pl.'s Mem."). On November 16, 2007, Defendants filed their Reply memorandum in support of their motions to dismiss and in opposition to Plaintiff's motion to amend ("Defs.' Reply"). On November 28, 2007, Plaintiff filed his Reply memorandum in opposition to Defendants' motions and in support of his own ("Pl.'s Reply"). The Court heard oral argument on the pending motions on May 15, 2008 ("Oral Argument").

---

[16] This Complaint was docketed as No. 06 Civ. 3410.

[17] The Complaint in No. 06 Civ. 3440 was filed on May 4, 2006, the Complaint in No. 06 Civ. 3544 was filed on May 10, 2006, and the Complaint in No. 06 Civ. 4638 was filed on June 16, 2006.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all of the factual allegations in the Complaint and draw all reasonable inferences in Plaintiff's favor. *ATSI Commc'ns*, 493 F.3d at 98; *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Ultimately, the Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The PSAC must therefore satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Motion to Amend

Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend its pleadings by leave of the court, and further directs that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). "In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *accord McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200-02 (2d Cir. 2007). Here, Defendants do not argue that they would be unduly prejudiced by permitting the amendments or that there was undue delay by Plaintiff in seeking leave to amend. Rather, Defendants oppose the proposed amendments solely on the ground that such amendments would be futile. (*See, e.g.*, Defs.' Reply at 5.) "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 272 (2d Cir. 1996) (noting that "futility is a 'good reason' to deny leave to amend"); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("When the plaintiff has submitted a proposed amended complaint, the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted."). Accordingly, the Rule 12(b)(6) standard applies both to Defendants' motions to dismiss as well as to Plaintiff's cross-motion to amend.

### C. Securities Fraud

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns*, 493 F.3d at 99. The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities

Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).

### 1. Rule 9(b)

While the rules of pleading in federal court usually require only "a short and plain statement" of the plaintiff's claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "state[d] with particularity," Fed. R. Civ. P. 9(b). *See ATSI Commc'ns*, 493 F.3d at 99. "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *Id.* (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)). Thus, in order to satisfy Rule 9(b), the plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (internal quotation marks and citation omitted); *see also ATSI Commc'ns*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

### 2. PSLRA

In the context of securities fraud allegations, the PSLRA has expanded on Rule 9(b)'s pleading requirements. *See* 15 U.S.C. § 78u-4(b). "The statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc.*

*v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)). "Therefore, '[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)) (alteration in original).

### III. DISCUSSION

### A. The PSAC

### 1. The Relevance of the CAC

As an initial matter, the Court identifies the pleading that will be the subject of this decision. In responding to Defendants' motion to dismiss the CAC, Plaintiff has abandoned his initial pleading, indicating that he "will defend the sufficiency of the [PSAC] rather tha[n] the initial [CAC]," and cross-moved for leave to file the PSAC. (Pl.'s Mem. at 1.) Accordingly, the Court will evaluate the viability of Plaintiff's claims as set forth in the PSAC, not the CAC.

Moreover, in evaluating Defendants' motion, the Court declines to rely upon facts alleged in the initial CAC and omitted from the PSAC, but which Defendants nevertheless deem relevant to their motion. Defendants correctly point out the Second Circuit's holding that "[t]he amendment of a pleading does not make it any the less an admission of the party." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989)

13

(citing, *inter alia*, *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984)).  However, the Second Circuit formulated that rule in the context of a district court's refusal to admit a prior, inconsistent pleading as evidence at trial, finding "that the district court's refusal to permit the jurors to be informed of the amendment [of the complaint] and to examine the original complaint so that they could contrast it with the amended complaint was a substantial abuse of discretion."  *Id.*; *see also id.* (holding that the plaintiff "cannot advance one version of the facts in [his] pleadings, conclude that [his] interests would be better served by a different version, and amend [his] pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories" (alterations in original) (internal citation and quotation marks omitted)).

Defendants have failed to present any persuasive authority that a similar rule should apply upon consideration of a motion to dismiss, where the Court is obliged to evaluate the sufficiency of the pleading itself, as well as any materials attached thereto or within the scope of judicial notice. Defendants cite one district court decision where the court, citing *Andrews*, concluded that "[a]dmissions in earlier complaints remain binding when a plaintiff files subsequent pleadings." *Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003). However, the court in *Sulton* failed to explain why the Second Circuit's ruling in *Andrews* regarding the admissibility of prior pleadings as evidence *at trial* — where the jury is charged with resolving disputed issues of fact — bound the plaintiff to the facts alleged in his prior pleading at the motion to dismiss stage — where the court is required to accept as true the facts alleged in the version of the

pleading before the Court.  *See Cleveland*, 448 F.3d at 521.

Rather, to adopt the approach urged by Defendants runs contrary to the Federal Rules' pronouncements that leave to file amended pleadings shall be freely given, *see* Fed. R. Civ. P. 15(a), and that "[a] party may state as many separate claims or defenses as it has, regardless of consistency," Fed. R. Civ. P. 8(d)(3).  *See In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006) ("While prior inconsistent pleadings normally are admissible against a party, they ordinarily are 'controvertible, not conclusive' admissions."); *accord The Limited, Inc. v. McCrory Corp.*, 683 F. Supp. 387, 395 n.5 (S.D.N.Y. 1988).  As another district court has noted:

> It is not uncommon for litigants to amend pleadings in response to deficiencies pointed out by an adversary or even by the Court, either before a dispositive motion is filed or in response to a ruling on a motion that grants leave to replead and offers specific guidance as to how any flaws in the pleadings may be cured to survive dismissal. . . .  Not surprisingly, some later pleadings made in this context necessarily may be at odds with allegations the party asserted in the original pleadings.  It would be a harsh rule of law indeed if a litigant were to change a statement in an amended pleading to repair a weakness cited by an adversary or by the Court, only to have the case dismissed because the conforming change in some way may conflict with an allegation in the earlier pleadings.

*Streit v. Bushnell*, 424 F. Supp. 2d 633, 639 n.4 (S.D.N.Y. 2006).  The Court therefore looks to the PSAC as the legally operative pleading for purposes of Defendants' motion to dismiss.

### 2.  The Confidential Informants

In the PSAC, Plaintiff relies, at least in part, on information allegedly obtained from four confidential informants ("CI").  (*See* PSAC ¶¶ 23-26.)  CI #1 was allegedly an underwriter at PXRE during the Class Period who "reported to [individual] [D]efendant Hengesbaugh" and left the Company in April 2006.  (*Id.* ¶ 23.)  CI #2 allegedly served as PXRE's Vice President "in charge of . . . risk modeling" from 1999 to mid-2006, and, in that role, was "directly involved in preparing loss estimates for Katrina."  (*Id.* ¶ 24.)  CI #2 "routinely communicated with PXRE's underwriters and its Chief Actuary" and "sometimes overheard conversations between the [i]ndividual Defendants, the Chief Actuary, and in-house underwriters due to PXRE's open floor plan."  (*Id.*)  CI #3 is allegedly the "Chief Actuary of a reinsurance company" that, according to Plaintiff, is a "peer" company of PXRE.  (*Id.* ¶¶ 25, 95.)  CI #4 was allegedly an underwriter and Vice President of international operations at PXRE during the Class Period, before leaving the Company in May 2007.  (*Id.* ¶ 26.)

The Second Circuit has held that "where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  "Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Id.* For purposes of the following analysis, the Court finds no deficiency in Plaintiff's failure to provide the names of the four Confidential Informants.  Accordingly, the Court assumes all facts alleged in Plaintiff's PSAC to be true, including those facts provided by the four Confidential Informants.[18]

### B.  Section 10(b) Claim

"Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith."  *In re*

---

[18]  The Court recognizes that, in light of the Supreme Court's ruling in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), the Seventh Circuit has held that allegations from confidential witnesses must be discounted, because "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007).  The Court declines to follow this approach absent guidance from the Second Circuit, and will continue to consider allegations based on information provided by confidential sources without discounting those allegations due *solely* to the anonymity of the information's source.  Other courts in this District have proceeded similarly.  *See, e.g.*, *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008) (declining to adopt the *Higginbotham* standard); *In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234 (HB), 2007 WL 2572088, at *3 n.3 (S.D.N.Y. Sept. 7, 2007) (noting that "anonymous sources do not have to be identified," and finding that the provided descriptions of the confidential sources were sufficient to allow the court "to infer that the witnesses are likely to posses the information contained in their statements").

*Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)). The Securities and Exchange Commission implemented section 10(b) of the Exchange Act by promulgating Rule 10b-5, 17 C.F.R. § 240.10b-5. In relevant part, Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

In order to sustain a private cause of action[19] for securities fraud under section 10(b) and Rule 10b-5, a plaintiff must adequately plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 613 (S.D.N.Y. 2008). In this case, Defendants argue that Plaintiff has failed to plead sufficiently two of the necessary elements: scienter and materiality. As the Court finds that Plaintiff has failed to plead scienter adequately, the Court does not consider the issue of materiality.

Under the PSLRA, in order to plead scienter adequately and state a claim under section 10(b) and Rule 10b-5, it is necessary

---

[19] Although the text of the Exchange Act does not explicitly provide for a private cause of action for section 10(b) violations, "[i]t is now established that a private right of action is implied under § 10(b)." *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971).

to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst*, 425 U.S. at 193 n.12).

Second Circuit case law, which predates the passage of the PSLRA, provides that "[t]he requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). In *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), the Court of Appeals explicitly noted that "both options for demonstrating scienter, either with motive and opportunity allegations or with allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness, survive the PSLRA." *Id.* at 138-39; *see also, e.g.*, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting *Shields*, 25 F.3d at 1128).

The Supreme Court, in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), has interpreted the PSLRA's "strong inference" requirement, and has held that, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 127 S. Ct. at 2509. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw

from the facts alleged." *Id.* at 2510.  In so assessing, a court must be careful to consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 2510 (internal citation omitted).  Rather, the question before a court on a motion to dismiss is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.  In short, to determine whether Plaintiff's purported inferences of scienter are sufficiently "strong," the Court "must consider both the inferences urged by the [P]laintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA*, 553 F.3d at 198.

In analyzing whether Plaintiff has pleaded the requisite "strong" inference of scienter, the Court will utilize the Second Circuit's overarching framework of "motive and opportunity" and "conscious misbehavior or recklessness."[20]   Within each prong of that

framework, the Court will assess (1) whether Plaintiff's allegations suffice to plead a "strong" inference of scienter as required by the Second Circuit's case law, as well as (2) whether Plaintiff's allegations give rise to an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged," as required by *Tellabs*, 127 S. Ct. at 2510. While the Court distinguishes the *Tellabs* analysis from the analysis under the Second Circuit's case law, the Court finds that the two analyses are very much interrelated, and that the determination of whether Plaintiff has pleaded the proper "strong" inference of scienter under Second Circuit case law serves as a significant, if not determinative, factor in assessing whether Plaintiff has pleaded the proper "strong" inference of scienter under *Tellabs*.[21]

---

[20]   While at least one court in this District has noted that "[e]xamining the allegations separately under the rubrics of 'motive and opportunity' and 'conscious misbehavior or recklessness' is unduly formalistic and not required by the PSLRA," *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 451 n.146 (S.D.N.Y. 2005), the Second Circuit continues to utilize this two-pronged framework, *see ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.* 553 F.3d 187, 198-203 (2d Cir. 2009), and has explicitly rejected the adoption of a "third method of demonstrating scienter," *see Kalnit v. Eichler*, 264 F.3d 131, 141 & n.5 (2d Cir. 2001) ("Here, plaintiff seeks to combine inadequate allegations of motive with

inadequate allegations of recklessness . . . to demonstrate scienter.  Plaintiff offers no support for his approach, and we decline to accept it. . . . To the extent that plaintiff argues that our decision in *Novak* . . . created a third method of demonstrating scienter, we reject such a contention.").   Although the Court of Appeals has not explicitly ruled on whether this language in *Kalnit* has survived the Supreme Court's decision in *Tellabs*, the Court will continue to follow Second Circuit precedent and analyze securities fraud allegations under the two-pronged "motive and opportunity" and "conscious misbehavior or recklessness" framework.

[21]   The Court notes that the Second Circuit has not clarified the exact relationship between its own case law, pre-dating (but surviving the passage of) the PSLRA, which requires the pleading of a "strong" inference of scienter, and the Supreme Court's recent ruling in *Tellabs*, which interprets the PSLRA's requirement that a securities fraud plaintiff plead a "strong" inference of scienter.  However, in *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008), the Court of Appeals indicated that the two analyses are interrelated, finding that, "[a]s a result" of the plaintiff's failure to allege that any of the defendants possessed a "compelling

In any event, for the reasons that follow, the Court finds that Plaintiff has failed to sufficiently plead the requisite strong inference of scienter.[22]

---

motive to mislead investors," "a number of competing inferences regarding scienter arise." *Id.* at 197. Indeed, a finding by a court that a securities fraud plaintiff has failed to allege a proper "concrete and personal" benefit, as required by Second Circuit case law to allege "motive and opportunity" to commit fraud, *see infra*, certainly makes competing, non-fraudulent inferences more "compelling" for purposes of the *Tellabs* analysis. Likewise, it follows naturally from a finding that a securities fraud plaintiff has failed to allege recklessness under Second Circuit case law that the more "compelling" inference is that the defendants were merely negligent.

[22] In *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008), the Second Circuit held that "[w]hen the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Id.* at 195. The Court finds that the only individuals whose intent could be imputed to PXRE on the pleaded facts are the individual Defendants. The Court thus focuses its analysis on the alleged fraudulent intent of the individual Defendants, which the Court imputes to PXRE.

The Court disagrees with Plaintiff's contention, *see* Letter dated July 8, 2008, that the intent of Matusiak, PXRE's Chief Actuary, should be imputed to PXRE. However, even if the Court were to find that Matusiak's intent should be imputed to PXRE, Plaintiff fails to allege that Matusiak (1) possessed a motive to defraud, or (2) engaged in behavior that exhibited conscious misbehavior or recklessness. Instead Plaintiff alleges that Matusiak was "concerned" with PXRE's loss estimate reports, and subsequently resigned from PXRE due to a fear that the loss estimate reports would "damage his professional reputation." (*See* PSAC ¶¶ 89-90.) Thus, the Court finds that there are no allegations of fraudulent intent on Matusiak's part that could be imputed to PXRE. The Court's conclusions regarding Matusiak, *see infra*, further preclude a finding of scienter based on Matusiak's knowledge of the alleged fraudulent scheme alone.

### 1. Motive and Opportunity

It is undisputed that Defendants had an "opportunity" to commit fraud.[23] *Cf. Chill*, 101 F.3d at 268 (noting that it is "indisputable that key directors and officers have [the] ability to manipulate their company's stock price" (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996))); *see also, e.g.*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired."). Therefore, the issue before the Court is whether Plaintiff has adequately pleaded "motive."

In essence, Plaintiff argues that Defendants "had the motive to keep the loss estimates low to protect the very survival of PXRE." (Pl.'s Mem. at 15.) Specifically, Plaintiff alleges that PXRE was vulnerable to a disaster like Hurricane Katrina because PXRE's initial loss estimate of $235 million for Katrina-related losses, as set forth in the September 11 release, represented 39% of the Company's capital surplus as of June 30, 2005. (PSAC ¶ 76.) Given these figures, and the knowledge that a downgrade below A- would have "catastrophic" consequences and "essentially put the Company out of business" (*see id.* ¶¶ 3, 75), Plaintiff alleges that Defendants were motivated to materially misstate loss estimates in order to avoid being

[23] In this context, opportunity "entail[s] the means and likely prospect of achieving concrete benefits by the means alleged." *Novak v. Kasas*, 216 F.3d 300, 307 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)) (internal quotation marks omitted).

downgraded below an A- credit rating (*see id.* ¶ 117(j)).  Doing so allowed PXRE to raise "desperately needed new capital," and prevented the triggering of cancellation clauses in PXRE's current reinsurance contracts.  (*See id.*)  It is undisputed that PXRE disclosed the full extent of its losses in February 2006, which resulted in the immediate downgrade of PXRE's rating to below the critical A- level, thereby triggering the "catastrophic" consequences of such a downgrade.  (*See id.* ¶¶ 103-116).  Thus, at first blush, it would appear that PXRE's alleged scheme accomplished little more than putting off the inevitable collapse of the Company for several months.  However, to meet the required "strong" inference of scienter, Plaintiff argues that "Defendants may well have thought that they could delay the release of the bad news until PXRE had raised $700 million in additional capital, and that this amount, together with the $475 million already raised, would be sufficient for PXRE to maintain the A- rating when disclosures were belatedly made."  (Pl.'s Mem. at 17.)

For the reasons that follow, the Court holds that Plaintiff has failed to allege a "strong" inference of scienter under the motive and opportunity prong.  First, Plaintiff has failed to allege a "concrete and personal" benefit resulting from the fraud, as required by the Second Circuit to plead the requisite "strong" inference of scienter.  *See Kalnit*, 264 F.3d at 139; *Novak*, 216 F.3d at 307-08.  Second, and related, Plaintiff has not alleged a motive that is "at least as compelling as any opposing inference one could draw from the facts alleged," as required by the Supreme Court.  *Tellabs*, 127 S. Ct. at 2510.

### i.  Plaintiff Fails to Allege a "Concrete and Personal" Benefit

In determining whether motive allegations entail the requisite "concrete and personal" benefit, the Second Circuit has held that "[m]otives that are generally possessed by most corporate directors and officers do not suffice" to plead securities fraud.  *Kalnit*, 264 F.3d at 139.  The Court of Appeals has provided four examples of such "generally possessed," and therefore, insufficient motives: (1) the desire to maintain a high corporate bond or credit rating, *see Philip Morris*, 75 F.3d at 813-14; (2) "the motive to maintain the appearance of corporate profitability, or of the success of an investment," *Chill*, 101 F.3d at 268; (3) the desire to maintain a high stock price in order to increase executive compensation, *see Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); and (4) the desire to prolong the benefits of holding corporate office, *see Shields*, 25 F.3d at 1130.  *See Novak*, 216 F.3d at 307.

By contrast, the Second Circuit has cited insider trading as the classic example of a "concrete and personal" benefit that suffices to plead motive to commit securities fraud.  *See Novak*, 216 F.3d at 308 (noting that "in the ordinary case, adequate motive arose from the desire to profit from extensive insider sales"); *see also, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-76 (2d Cir. 2001) (finding motive sufficiently pleaded where allegations supported the inference of "unusual" insider trading); *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (same).

This case, involving the alleged inflation of a credit rating in order to raise capital, falls in an ambiguous middle ground, situated

19

between these two poles. To determine whether these circumstances suffice to raise a strong inference of scienter, the Court is mindful of the Second Circuit's instruction that "what is required when endeavoring to plead facts supporting a strong inference of scienter by showing motive and opportunity is not a bare invocation of 'magic words such as 'motive and opportunity'' but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative of a strong inference of scienter." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Novak*, 216 F.3d at 311)). Accordingly, the Court looks to the "particular circumstances" of the two leading Second Circuit cases on this point.

In the first case, *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir. 1993), the defendant, Time Warner Inc. ("Time"), found itself with over $10 billion in debt after a merger. *Id.* at 262. To alleviate this burden, Time subsequently embarked on an unsuccessful campaign to find international "strategic partners" who would provide the necessary capital to the company. *Id.* Due to the failure of this campaign to fully alleviate Time's debt burden, Time was forced to seek an alternative method of raising capital, specifically, "a new stock offering that substantially diluted the rights of the existing shareholders." *Id.* The plaintiff's claim for securities fraud in *Time Warner* alleged that Time was motivated to misrepresent the status of the negotiations with "strategic partners" and to conceal its active consideration of a stock offering in order to "enabl[e] the company to set the rights offering price somewhat higher than would have been possible without the misleading statements and to lessen the dilutive effect of the offering." *Id.* at 269. The Court of Appeals,

acknowledging that it faced a "close question," found this alleged motive sufficient to withstand a motion to dismiss.

By contrast, in *Philip Morris*, the Circuit, again confronted with what it described as a "close question," found insufficient the motive to maintain a high bond or credit rating, "so as to maximize the marketability of the $700 million of debt securities . . . and minimize the interest rate on those securities." *Philip Morris*, 75 F.3d at 813. In that case, the defendant allegedly "misrepresented or failed to disclose to the market that Marlboro sales were declining at such a rate that raising prices would not compensate for the loss of sales, and that the company was actively considering a new and alternative strategy of cutting Marlboro prices in order to increase market share at the expense of short-term profits." *Id.* at 805. As the court explained: "We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because '[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *Id.* at 814 (quoting *Acito*, 47 F.3d at 54) (alteration in original).

While the alleged motivation in this case falls somewhere in between the naked motive allegations in *Philip Morris* and the more specific motive allegations in *Time Warner*, the Court finds that, just as maintaining a high bond or credit rating to raise money was found to be too generalized a motive to plead securities fraud in *Philip Morris*, so too is the desire to maintain a high credit rating to raise money that is "desperately needed" or necessary "to protect the very survival" of a company in PXRE's circumstances. The

alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price — even if such a drop would allegedly threaten the "survival" of a company — is far too generalized (and generalizable) to allege the proper "concrete and personal" benefit required by the Second Circuit. *Cf. Kalnit*, 264 F.3d at 142 (noting that the "plaintiffs have not pointed to any specific benefit that would inure to the defendants that would not be . . . generalized to all corporate directors[,] . . . not just the defendant directors specifically"). Other courts in this District presented with similar allegations of motive have reached the same conclusion. *See, e.g.*, *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *16, *26 n.14 (S.D.N.Y. Jan. 26, 2009) (finding, in circumstances also involving a reinsurance company's alleged fraudulent maintenance of a credit rating in the wake of Hurricane Katrina in order to "obtain additional capital," that the defendant's "desire to maintain an 'excellent' credit rating from A.M. Best, a motive to maintain a financial rating to protect the *viability* of the Company[,] is not sufficient, under the law of this Circuit, to establish a motive to commit fraud" (emphasis added)); *Zirkin v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 851 (RPP), 2009 WL 185940, at *12 (S.D.N.Y. Jan. 23, 2009) ("A motive to maintain a higher financial rating to protect the viability of the Company, which is what the Complaint alleges here, is not enough, under the law of this Circuit, to sufficiently put forth a claim that a statement contained in an offering document was 'fraudulent' at the time it was made."); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, *to avoid bankruptcy*, or to finance the successful launch of a promising product. . . .

These allegations do not support an inference of scienter." (emphasis added)); *In re Emex Corp. Sec. Litig.*, No 01 Civ. 4886 (SWK), 2002 WL 31093612, at *6 (S.D.N.Y. Sept. 18, 2002) ("'[A] desire to raise much needed capital' is an insufficient generalized motive to support an inference of scienter." (quoting *Glickman v. Alexander & Alexander Serv., Inc.*, No. 93 Civ. 7594 (LAP), 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996))); *see also In re Gilat Satellite Networks, Ltd.*, No. 02 Civ. 1510 (CPS), 2005 WL 2277476, at *19 (E.D.N.Y. Sept. 19, 2005) (noting that "[c]ourts have subsequently described 'a desire to raise much needed capital' as amongst the broadest, most generalized, and most commonplace motives of corporate motivation for any action" (quoting *Glickman*, 1996 WL 88570, at *6)); *Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ. 8761 (HB), 2000 WL 977673, at *4 n.5 (S.D.N.Y. July 17, 2000) (finding that "allegations that defendants were 'motivated by' a desire to raise capital or 'benefitted' by raising capital are insufficient").[24]

_____

[24] While there is undoubtedly some tension between *Time Warner* and *Philip Morris*, in *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000), the Second Circuit explained its holding in *Time Warner* by stating that, "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman*, 220 F.3d at 93 (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993)). Courts in this District have interpreted *Rothman*'s language to limit *Time Warner*'s reach to the alleged "desire to carry out corporate *acquisitions*," which, significantly, is not a motivation allegedly possessed by Defendants in this case. *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 450-51 (S.D.N.Y. 2005) (emphasis in original); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("Scienter may be imputed, as is the case here, to defendants when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating

Plaintiffs may not evade the requirements set forth by the Second Circuit in *Philip Morris* merely by alleging that the maintenance of a credit rating and the raising of capital was necessary "to protect the very survival" of the company. To find otherwise would eviscerate the court's holding in that case. The Second Circuit has clearly established that to plead motive a securities plaintiff must plead a "concrete and personal" benefit to be realized from the allegedly improper behavior. The Court finds that raising capital as part of an amorphous scheme to stave off a company's collapse, as in this case, does not suffice. Such a motive is too generalized, and if scienter could be pleaded on that basis alone, virtually any company that attempted to raise capital, especially in a woeful economic climate, would face specious securities fraud allegations. The Court thus finds that the motivation to inflate a credit rating and raise capital in these circumstances is similar to the other "generally possessed" and insufficient motives enumerated by the Court of Appeals in *Novak*. Accordingly, the Court holds that Plaintiff has failed to plead facts sufficient to demonstrate the requisite "strong" inference of scienter necessary to commit securities fraud under the Second Circuit's "motive and opportunity" prong.

### ii.  Plaintiff's Purported Inference of Scienter Fails under *Tellabs*

The Court also finds that a reasonable person would not deem Plaintiff's purported inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. Plaintiff alleges that Defendants were motivated to misstate their loss estimates in order to maintain a high credit rating and raise money, only to reveal the true extent of their losses several months later. Plaintiff explains Defendants' motivation as follows: "Defendants may well have thought that they could delay the release of the bad news until PXRE had raised $700 million in additional capital, and that this amount, together with the $475 million already raised, would be sufficient for PXRE to maintain the A- rating when disclosures were belatedly made." (Pl.'s Mem. at 17.)

Plaintiff's purported theory is certainly one inference that could be drawn from the alleged facts. However, the seeming futility of Defendants' alleged scheme is relevant to the analysis. *Cf. In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 443 (S.D.N.Y. 2005) ("When evaluating motive and opportunity allegations, the Second Circuit authorizes inquiry, even at the motion to dismiss stage, as to whether plaintiffs allege a scheme that has any chance of achieving its putative ends."). Assuming Defendants knew the true extent of PXRE's loss estimates, as Plaintiff alleges, payment to PXRE's cedents was inevitable, as was the downgrade of PXRE's credit rating. Accordingly, if Defendants were truly motivated to raise capital to offset their full loss disclosures of more than $800 million, it is odd that Defendants did not attempt to raise enough capital to offset PXRE's entire losses, or, given the amount of capital raised as of February 2006, delay the disclosure of the full extent of PXRE's losses until some later time. Plaintiff's inference of scienter is further belied by: (1) Defendants' willingness to issue a steady stream of press releases, replete with cautionary language, informing the public of PXRE's updated initial loss estimates as more information became available, and (2) Defendants' disclosure of the existence of

---

stock prices.").

higher industry-wide loss estimates in the Form 10-Q.[25]

Also relevant is the Court's conclusion that Plaintiff has failed to allege that Defendants were motivated to obtain a "concrete and personal" benefit, as required by the Second Circuit. *See supra* note 21. As a result of this failure, the Court finds that "a number of competing inferences regarding scienter arise." *Teamsters*, 531 F.3d at 197. One of these competing inferences is that Defendants, without motive to defraud, simply failed in their various models and internal mechanisms to calculate accurately the full extent of losses that were incurred by the unique phenomenon presented by the 2005 hurricane season, particularly Hurricane Katrina, one of the most devastating hurricanes ever to land on the shores of the United States. The Court finds this competing inference to be simply more compelling than Plaintiff's purported inference of scienter: that Defendants were motivated to stave off PXRE's collapse for several months in a desperate gamble to preserve the viability of the Company. (*See* Pl.'s Mem. at 17 ("Defendants could have been desperately gambling that, at the end of the day, the actual flood claims tally would be much smaller than the massive exposure known or recklessly ignored by them during the Class Period.").)[26]

This holding still leaves open the question of whether Defendants were reckless in failing to calculate properly the full extent of the losses resulting from the three hurricanes. The Court now turns to this question.

## 2. Conscious Misbehavior or Recklessness

As noted above, under Second Circuit case law, a securities fraud plaintiff may establish a "strong" inference of scienter "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290-91 (internal quotation marks and citations omitted). Having found that Plaintiff has failed to plead scienter under the "motive and opportunity" prong, the Court next turns to whether Plaintiff has pleaded scienter under the "conscious misbehavior or recklessness" prong. Plaintiff alleges no facts to support an inference that Defendants engaged in "conscious misbehavior."[27] Accordingly, the issue before the Court is whether Plaintiff has adequately pleaded "recklessness."

---

[25] This latter fact is discussed in more detail in the following section of this Opinion and Order.

[26] Similarly, the Court finds it a more compelling inference that Defendants' efforts to raise capital were attempts to bolster an inadequate capital surplus given the loss amounts initially disclosed by PXRE. The Court finds this inference to be more compelling than the one proffered by Plaintiff: that Defendants, knowing the full extent of PXRE's losses, were motivated to raise capital as part of a scheme so that when the full extent of PXRE's losses were eventually disclosed, there would be a slight possibility that its insurance

---

rating would not fall below the crucial A- rating. Plaintiff's own factual allegations support this non-culpable inference. (*See, e.g.*, PSAC ¶¶ 63 (noting that Defendants' announcement of a public offering following the September 28 release was made "in an attempt to assuage the ratings agencies' concerns that the Company lacked sufficient capital"); 117(k) ("Even with the Company's initial low ball estimate of $235 million of Katrina related losses, at least 39% of the Company's capital surplus was at risk.").)

[27] Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (internal citations omitted).

To support a "strong" inference of recklessness, Plaintiff alleges that the software used by Defendants to calculate PXRE's loss estimates was flawed in that (1) it was unable to calculate losses due to river flooding, and (2) its model became unreliable once industry-wide loss estimates exceeded $35 billion. (*See* PSAC ¶¶ 43-44.) Plaintiff also alleges that Defendants failed to make the necessary upward adjustments to these flawed estimates during PXRE's "ground up" contract-by-contract analysis (*id.* ¶¶ 42, 45), and, as a result, issued false and misleading statements in the September 11 release, the September 19 release, the September 28 release, the October 17 Proxy Statement, the October 27 release, and the Form 10-Q, issued on October 28, 2005 (collectively, the "challenged statements"). Plaintiff argues that "Defendants 'knew facts or had access to information' that plainly revealed the deficiency of the challenged statements," (Pl.'s Mem. at 18 (citing *Novak*, 216 F.3d at 308, 311)), and that, accordingly, Defendants were reckless in promulgating the challenged statements.

For the reasons that follow, the Court holds that Plaintiff has failed to allege the requisite "strong" inference of scienter under the "conscious misbehavior or recklessness" prong. First, Plaintiff has failed to adequately allege that Defendants knew or were reckless in not knowing that the challenged statements were false or misleading, as required by the Second Circuit. Second, the Court finds that it follows naturally from this conclusion that Plaintiff's purported inference of scienter is not "at least as compelling as any opposing inference one could draw from the facts alleged," as required by the Supreme Court in *Tellabs*, 127 S. Ct. at 2510.

i. Plaintiff Fails to Allege that Defendants Knew or Were Reckless in Not Knowing that the Challenged Statements were False or Misleading

In *Novak*, the Second Circuit "defined reckless conduct as, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (internal quotation marks and citations omitted) (alteration in original). "Recklessness in the scienter context cannot be merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005). In other words, "'an allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness.'" *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (quoting *Troyer v. Karcagi*, 476 F. Supp. 1142, 1152 (S.D.N.Y. 1979)); *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (noting that "the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud"). Further, if a plaintiff fails to allege adequate motive, as in this case, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater. *See Kalnit*, 264 F.3d at 142; *see also Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987) ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." (internal citations omitted)).

Under Second Circuit case law, recklessness is adequately alleged when a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.[28]  Here, Plaintiff argues that "Defendants 'knew facts or had access to information' that plainly revealed the deficiency of the challenged statements," (Pl.'s Mem. at 18 (citing *Novak*, 216 F.3d at 308, 311)), and argues that several factual allegations from the PSAC raise a strong inference of Defendants' conscious misbehavior or recklessness in issuing the challenged statements.  Specifically, Plaintiff points to: (1) Matusiak's expression of concern and subsequent resignation; (2) PXRE's peers' decision to increase their loss estimates before PXRE; (3) PXRE's failure to adopt RMS's higher industry-wide loss estimates of $40 billion to $60 billion; (4) the widespread publicity surrounding the commercial flooding losses in New Orleans; (5) the timing of Modin's departure and Hengesbaugh's negotiation of a "golden parachute"; and (6) the magnitude of PXRE's understatement.  (*See* Pl.'s Mem. at 18-20.)

To determine whether a plaintiff has "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements," *Novak*, 216 F.3d at 308, "Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re Marsh &*

*McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (emphasis added); *see also Coronel*, 2009 WL 174656, at *27 (noting that "'to establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made'" (quoting *Silva Run Worldwide Ltd. v. Bear Stearns & Co.*, No. 96 Civ. 5102 (WK), 2000 WL 1672324, at * 4 (S.D.N.Y. Nov. 6, 2000))); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 365, 378 (S.D.N.Y. 2007) ("In order for a statement to be false or misleading, a plaintiff must allege that the speaker was aware of adverse information at the time he spoke.").

In this case, Plaintiff's allegations of recklessness are deficient in both aspects just emphasized.  First, Plaintiff fails to allege that Defendants had access to information that *specifically* informed them of the alleged flaws in the preparation of PXRE's loss estimate reports: namely, that PXRE's software was unable to calculate losses due to river flooding and became unreliable once industry loss estimates exceeded $35 billion.  Second, although the last challenged statement was the Form 10-Q issued by Defendants on October 28, 2005, several of Plaintiff's allegations involve either vague dates, or dates that occurred after October 28, 2005.  Thus, Plaintiff fails to allege that Defendants had knowledge of *specific* contradictory information, or, in several instances, that the information was available *at the same time* that Defendants made the challenged statements.

a. Plaintiff's Individual Allegations

In determining whether Plaintiff's factual allegations give rise to a "strong" inference of

---

[28]  Under Second Circuit case law, a strong inference of scienter may also arise under the "conscious misbehavior or recklessness" prong "where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Novak*, 216 F.3d 308.

scienter, the Court must consider whether "*all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.*" *Tellabs*, 127 S. Ct. at 2509 (emphasis in original). Although the Court is mindful of this fact, for the sake of clarity and ease of analysis, the Court will first examine Plaintiff's factual allegations individually, before undertaking the required holistic assessment.

### (1) Matusiak's Expression of Concern and Subsequent Resignation

Plaintiff argues that the "compelling need to make substantial adjustments" to Defendants' loss estimates "was painfully underscored by [Chief Actuary] Matusiak's expression of serious concerns about the underestimation and the adequacy of reserves — he actually quit rather than sign off on the misleading estimates." (Pl.'s Mem. at 18.)[29] Plaintiff specifically alleges, based on information provided by CI #2, that "in e-mails and verbal communications, Matusiak repeatedly expressed concerns about the sufficiency of the Company's loss estimates because of the exclusion of damages from the New Orleans flooding." (PSAC ¶ 89.) Additionally, Plaintiff alleges that "CI #2 recalls that Matusiak was concerned that given the extensive damage in the region, 'our reserve number is not large enough.'" (*Id.* (quoting Matusiak).) "According to CI #2, Matusiak quit the Company because he feared that PXRE's erroneous loss estimates would damage his professional reputation. Indeed, Matusiak left PXRE in late October or early November, well before the time that he would have had to sign the Company's Statement of Actuarial Opinion." (*Id.* ¶ 90.)

Significantly, there is no allegation in the PSAC that these concerns, communicated from Matusiak to CI #2, were ever brought to the attention of the individual Defendants, or anyone else at PXRE. At Oral Argument, Plaintiff's counsel admitted that "[t]here's nothing in the [PSAC] that indicates that other than having, obviously, shared his position or known of Mr. Matusiak's concerns, that [CI #2] shared it with any of the individual [D]efendants." (Oral Argument at 41-42.) Further, there is no allegation in the PSAC that CI #2 heard others discussing the specific concerns that Matusiak had expressed. (*See id.* at 37-38.)[30] Rather, Plaintiff relies on "PXRE's intimate corporate culture," noting that "the size and culture of the Company could not have allowed the egregious errors in the Company's Katrina loss estimates to go unnoticed by its top executives." (PSAC ¶ 101.)

The Court finds that such allegations fail to sufficiently plead that Defendants were aware of Matusiak's "concerns." Plaintiff's own citations demonstrate the allegations required to infer such knowledge. For example, Plaintiff cites *Ruskin v. TIG Holdings*, No. 98 Civ. 1068 (LLS), 2000 WL 1154278 (S.D.N.Y. Aug. 14, 2000) (*see* Pl.'s Mem. at 19), in which the court found that "[a] July 10, 1997 memorandum from Don D. Hutson . . . , TIG's president and chief operating officer, to Rotenstreich [TIG's chief

---

[29] Plaintiff also points to "concerns raised by underwriters." (Pl.'s Mem. at 18.) However, this allegation is far too vague to raise a strong inference of scienter.

[30] The absence of such an allegation in the PSAC is particularly significant given Plaintiff's allegation that CI #2 "sometimes overheard conversations between the [i]ndividual Defendants, the Chief Actuary, and in-house underwriters due to PXRE's open floor plan." (PSAC ¶ 24.)

executive officer and chairman of its board of directors] reveals that TIG was aware of 'a significant reserve deficiency' at TIG Re." *Ruskin*, 2000 WL 1154278, at *2. In this case, Plaintiff fails to allege that such a memorandum, or any other form of direct communication, notified the individual Defendants of Matusiak's "concerns." Plaintiff also cites *In re Oxford Health Plans, Inc. Securities Litigation*, 187 F.R.D. 133 (S.D.N.Y. 1999) (*see* Pl.'s Mem. at 18), which likewise makes evident the kind of factual allegations necessary to infer actual knowledge:

> Plaintiffs provide the following examples of the Individual Defendants' knowledge: (1) in April 1996, defendant Wiggins was told by Ken Boyles, the recently hired chief information officer, that the planned computer conversion could not be done reliably; (2) in October 1996, certain members of the Board and management including Wiggins and Sullivan held an emergency meeting and determined that Oxford should hire Oracle to evaluate the failed computer conversion; (3) the Individual Defendants received a report from Oracle dated November 1, 1996, warning Oxford that the computer system was missing critical applications and could not handle any new functions; (4) the Individual Defendants had access to NYSID reports, dating back to 1990, that indicated that Oxford's internal controls and accounting practices were deficient; (5) the Individual Defendants were aware that the magnitude of the increase in Oxford's premiums receivable per member during the fourth quarter of 1996 was unprecedented and highly irregular; and (6) the Individual Defendants were aware that the computer system could not age the premiums receivable or unpaid claims and could not keep current membership data.

*In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. at 139.

In short, Plaintiff's own citations, *Ruskin* and *Oxford Health Plans*, both involved the defendants being *directly informed* of the alleged deficiencies. Here, Plaintiff argues that the individual Defendants *must have known* of Matusiak's concerns, due to their positions in PXRE, and due to PXRE's "intimate corporate culture." The Court finds that such allegations fail to support an inference that Defendants knew, or had access to, Matusiak's "concerns." *See Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) (noting that "bare assertions [that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports], without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements"). Plaintiff points to no case in which a court in this District has inferred a "top executive's" "access" to contrary facts based on the expression of "concerns" from one employee to another, a subsequent resignation due to fear of damage to a professional reputation, and the "size and culture" of a company. Indeed, the recent case law in this District suggests that much more is required. *See e.g.*, *Steinberg v. Ericsson LM Tel. Co.*, No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (finding that the plaintiff failed

27

to allege the defendants' knowledge or access to contradictory facts with sufficient particularity, because the "the Complaint fails to identify any reports Defendants . . . saw, or any conversations in which they were provided information, that was inconsistent in any way with their public statements"); *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2008 WL 4307981, at *7 (S.D.N.Y. Sept. 16, 2008) ("Plaintiffs also have alleged that IMAX executives had specific knowledge of the progress of each theater system installation.  IMAX apparently had employees at each installation site who would report back to senior executives on its status.  Reports containing schedules for theater installations were sent by the Finance Department to the attendees of a weekly meeting held at IMAX's Canadian headquarters, the purpose of which was to discuss theater openings and address the timeliness of the projects.  The complaint further alleges that monthly sales reports detailing the number of theater systems installations were circulated via e-mail." (citations omitted)); *S.E.C. v. Badian*, No. 06 Civ. 2621 (LTS), 2008 WL 3914872, at *5 (S.D.N.Y. Aug. 22, 2008) ("In addition, the Complaint alleges facts demonstrating that [the defendants] Badian, Spinner, and Drillman knew that their trading was artificially depressing the price of Sedona stock.  On March 21, 2001, Badian congratulated [another defendant] Graham for his efforts that led to the collapse of Sedona's stock price.  Two days later, Badian called Graham and said, 'On Sedona, keep on wailing [sic] away, this is very good.' Drillman acknowledged that they had managed to 'drive [Sedona's stock] down to three quarters.'  Spinner told a colleague, 'Want to short something illegally for twelve months?  You got my number.'  Spinner also expressed his concern to Badian that Sedona's stock price would begin to rise after they had ceased their selling pressure." (internal citations omitted)).

Further, Plaintiff provides no time frame for Matusiak's expressions of "concern" to CI #2, an omission that Plaintiff's counsel conceded during Oral Argument.  (*See* Oral Argument at 32 ("There's no time frame for those discussions on Matusiak's part in the complaint."); *see also id.* at 35 ("[I]n terms of the time frame for a decision as to when these particular concerns were raised, we have not alleged them."); *id.* at 35-36 ("We believe that certainly by October, when the company is putting out its 10-Q and Mr. Matusiak would have been in a position to sign and certify or been called upon to certify the . . . [a]ctual results, that by that time, his successor has been appointed, and therefore, he has expressed his significant misgivings with these numbers.").)    While the Court is obligated to draw all inferences in Plaintiff's favor, there are *no* facts in the PSAC to support the inference that Matusiak expressed his "concerns" to CI #2 prior to the beginning of the Class Period, other than his alleged general involvement in the preparation of PXRE's loss estimates.

Finally, even if the Court were to assume that Matusiak expressed his "concerns" to the individual Defendants prior to the date of the first challenged statement, and that the individual Defendants knew or had access to these "concerns," it does not follow that the resultant generalized awareness of Matusiak's "concerns" made it reckless for the individual Defendants to rely on the prepared loss estimate reports.[31]    Matusiak's alleged

---

[31] Indeed, the cautionary language that accompanied the first challenged statement, the September 11 release, indicates that Defendants shared many of Matusiak's "concerns" from the outset.  (*See, e.g.*,

"concerns" were of a general nature — regarding the "sufficiency" of the loss estimates, the "exclusion of damages from the New Orleans flooding," and the fear that the "'reserve number is not large enough.'" (*See* PSAC ¶ 89 (quoting Matusiak).) Matusiak did not allegedly express any concern about the processes by which PXRE's loss estimates were prepared, and, significantly, expressed no concern detailing the *actual* deficiencies in PXRE's loss estimation process, that is, PXRE's *inability* to account for river flooding and the unreliability of PXRE's models with respect to industry-wide loss estimates greater than $35 billion. Absent allegations that the individual Defendants disregarded an employee's specific and direct communication about the alleged flaws in PXRE's loss estimation process, the Court does not find one employee's expression of "concern" about the initial loss estimation figures, especially in the wake of the unprecedented and uncertain monetary losses incurred by Hurricanes Katrina, Rita, and Wilma, necessarily constitutes evidence of negligence, let alone recklessness.[32]

---

Anderson Aff. Ex. C (the September 11 release) ("It is difficult . . . to accurately estimate losses in the immediate aftermath of any major catastrophe. The unique circumstances of Hurricane Katrina, including the unprecedented flooding, limited access by claims adjustors and the potential legal and regulatory issues, add even more uncertainty to the normal difficulties of estimating catastrophe losses.").)

[32] Given this conclusion, the Court likewise finds that Defendants' failure to *disclose* that Matusiak "had grave concerns about the loss estimates that were published" by PXRE, or that he quit "to avoid signing on to PXRE's loss estimates," is also insufficient to support a "strong" inference of scienter. (PSAC ¶ 4; *see also, e.g., id.* ¶¶ 51, 67.)

(2) PXRE's Peers' Decision to Increase Their
Loss Estimates Before PXRE

Plaintiff also argues that "Defendants' deliberate or reckless underestimation is also revealed by PXRE's competitors' decisions to dramatically increase their own damage estimates based on assumptions of industry losses in RMS' range." (Pl.'s Mem. at 19.) Plaintiff specifically alleges that, although "PXRE's peer reinsurance companies" initially estimated, like PXRE, that industry-wide losses from Hurricane Katrina would be between $30 billion and $40 billion, "as the extensive commercial (and covered residential) damages stemming from the broken levees in New Orleans became increasingly apparent, PXRE's peers eschewed the $30-$40 billion estimate because it failed to account for these damages." (PSAC ¶ 94.) Plaintiff quotes CI #3, "the Chief Actuary for a reinsurance company that competed with PXRE," as saying: "'Once it was clear to us that we had flood losses coming from the levee breaks, we started to try and include a load in our loss estimates to reflect that extra source of losses.'" (*Id.* ¶ 85 (quoting CI #3).) CI #3 is also quoted as saying that, "'[o]nce the levees broke, Companies like PXRE should have known that their loss estimates needed to include flood as a covered cause of loss. Perhaps not on every policy, but on most policies.'" (*Id.* ¶ 86 (quoting CI #3).)

To provide support for this argument, Plaintiff has created a chart, included in paragraph 95 of the PSAC, and also as Attachment A to Plaintiff's memorandum in support of his motion to amend and in opposition to Defendants' motion to dismiss (the "chart"). The chart provides a comparison of the various adjustments to the initial loss estimates promulgated by eleven

"peer" companies of PXRE following Hurricane Katrina. (*See* PSAC ¶ 95.) Specifically, the chart details: (1) the initial loss estimates of each peer company following Hurricane Katrina; (2) the "mid-class period adjustments"; (3) the percentage increase that these "mid-class period adjustments" constituted; (4) the "January-February 2006" adjustments, and (5) the percentage increase that these "January-February 2006" adjustments constituted. (*See id.*) The chart also provides the industry-wide estimates that each peer company relied on in promulgating their various loss estimates. (*See id.*)

In assessing this chart, the Court notes that Plaintiff has not provided the Court with any information regarding the "competitors" or "peers" included in this chart, either in his PSAC or in his various memoranda. The Court therefore concurs with Defendants that Plaintiff "fails to provide any information about the identities of each competitor's cedents, the levels of risk they assumed, the speed at which each company received information from its cedents or any of the myriad other factors that might distinguish them from PXRE." (Defs.' Reply at 21.) Given this failure, the chart's apparent focus on the percentage increase in loss estimates for each peer company is perhaps misplaced, as the Court would need such information to appraise these variations in percentage increases.

Accordingly, the Court finds that the most relevant information provided by the chart is the date by which each company raised its projected industry-wide loss estimates.[33] On

this point, Plaintiff alleges that "[b]y mid-November, 2005 . . . virtually all of PXRE's peers had significantly raised their projected losses based on RMS' estimate of industry wide losses of $40-60 billion, which included a $15-$25 billion component for commercial flooding in New Orleans." (PSAC ¶ 95.)[34]

As noted, PXRE issued its last challenged statement on October 28, 2005, with the Form 10-Q. Significantly, of the eleven "peer" companies provided by Plaintiff in the chart, only four, Converium Holdings, Endurance Re, Everest Re, and Odyssey Re, made "mid-class adjustments" that relied on RMS's higher industry-wide loss estimates prior to, or contemporaneous with, this date. (*See id.*)[35] Thus, construing the contents of

projected industry-wide loss estimates is the most significant information provided by the chart. (*See* Pl.'s Reply at 10 ("Such speculation [by Defendants in their Reply Memorandum] should not be the basis for dismissal, given the overwhelming consensus as to the likely range of *industry wide damages*, which by definition are not subject to the individual exposures of each reinsurance company." (emphasis in original)).)

[34] Although Plaintiff's chart only includes *eleven* peer companies, elsewhere in the PSAC, Plaintiff mentions *fifty-five* peer reinsurance companies, a number apparently gleaned from a September 26, 2005 report issued by the "Benfield Group." (*See, e.g.*, PSAC ¶¶ 9, 76.) Construing all facts in Plaintiff's favor, the Court assumes that, when Plaintiff alleges that by mid-November 2005, "virtually all of PXRE's peers had significantly raised their projected losses based on RMS' estimate of industry wide losses of $40-60 billion" (*id.* ¶ 95), Plaintiff is referring to all fifty-five of the alleged "peer" reinsurance companies, and not just to the eleven exemplars listed in Plaintiff's chart. However, Plaintiff fails to allege the dates by which the "peer" companies not referenced in the chart adopted RMS's higher industry-wide estimate.

[35] Although a fifth peer company, IPCRE, also made "mid-class" adjustments in October, Plaintiff does not allege that IPCRE's adjustments were related to an adoption of higher industry-wide loss projections, as

---

[33] Plaintiff concedes in his Reply Memorandum that, given the lack of information regarding the "peer" companies, the date by which each company raised its

Plaintiff's chart in his favor, as the Court must for purposes of deciding the motions currently before it, and assuming that the chart represents a listing of indistinguishable peer companies, only four out of eleven of PXRE's peer companies revised their loss estimates by relying on RMS's higher industry-wide loss projections of $40 billion to $60 billion by the most relevant date. The Court declines to infer, based on the behavior of four out of eleven of PXRE's peer companies, that Defendants were reckless in failing to adopt the higher RMS industry-wide projected loss estimates.

### (3) PXRE's Failure to Adopt RMS's Higher Industry-Wide Loss Estimates of $40 Billion to $60 Billion

Notwithstanding the behavior of PXRE's peer companies, Plaintiff also emphasizes PXRE's independent failure to follow the industry-wide loss estimates promulgated by RMS, which, as noted, estimated $40 billion to $60 billion in industry losses.

RMS's industry-wide loss estimate was published on September 9, 2005, prior to the onset of the Class Period. (*Id.* ¶ 93.) There is no allegation that this higher estimate was not publicly available. Further, Plaintiff does not allege that PXRE concealed its decision not to adopt RMS's publicly available loss estimate. To the contrary, in the Form 10-Q, PXRE explicitly and publicly acknowledged RMS's higher projection of industry-wide losses, and explained its decision to adopt the industry-wide loss estimates promulgated by two other

firms, AIR WorldWide ("AIR") and ISO's Property Claim Services ("ISO"). Specifically, PXRE stated in the Form 10-Q that, in calculating its "best estimate of liability for loss and loss expenses relating to Hurricanes Katrina and Rita," it had relied on industry-wide loss estimates of approximately $30 billion to $40 billion from Hurricane Katrina and approximately $2.5 billion to $6 billion from Hurricane Rita. (Anderson Aff. Ex. B (the Form 10-Q) at 37; *see* PSAC ¶ 70 (quoting the Form 10-Q).) In so doing, PXRE took note of the loss estimates prepared by RMS and AIR, which PXRE referred to as "two of the leading firms that develop and sell probabilistic catastrophe modeling technology," as well as an estimate prepared by ISO. (Anderson Aff. Ex. B (the Form 10-Q) at 37.) PXRE noted (1) AIR's estimates that industry-wide insured losses from Hurricane Katrina will be approximately $34 billion and between $4 billion and $5.5 billion from Hurricane Rita; (2) RMS's loss estimates of $40 billion to $60 billion from Hurricane Katrina and $3 billion to $5 billion from Hurricane Rita; and (3) ISO's estimate that "insured losses for Hurricane Katrina will be approximately $34.4 billion." (*Id.*)[36]

The Court finds it difficult to infer recklessness based on a reinsurance company's decision to follow the loss estimates promulgated by two out of three companies, and Plaintiff provides no factual allegations to aid the Court in making such an inference. Plaintiff does not mention either AIR or ISO in his PSAC, and therefore provides no basis to infer recklessness, or even negligence, from PXRE's reliance on these alternative industry-wide loss estimates in issuing the challenged statements. This

---

Plaintiff does for the other four peer companies discussed. (*See* PSAC ¶ 95.) The other six peer companies provided in the chart all made "mid-class" adjustments in November and December 2005, after the date on which PXRE issued the last challenged statement. (*See id.*)

---

[36] *See supra* Part I.A.2.ii.f (quoting the relevant language from the Form 10-Q in full).

conclusion is buttressed by Plaintiff's other factual allegations, already discussed, that by the end of October, only four out of eleven of PXRE's peer companies had adopted RMS's higher projection of industry-wide loss estimates.[37]

#### (4)  The Widespread Publicity Surrounding the Commercial Flooding Losses in New Orleans

Plaintiff also relies on four published articles as support for the proposition that, "[e]arly in the Class Period, the industry was well aware of the fact that there was extensive unmodeled, yet insured, commercial flooding (as well as covered residential flooding) resulting from the breached levees in New Orleans." (PSAC ¶ 81; *see also id.* ¶¶ 82-84, 87.)

Notwithstanding this assertion, the Court finds that these newspaper articles only pertain to the obvious: that Hurricane Katrina would result in extensive and, as of the dates of the articles' publication, unknowable damages due to heavy flooding, primarily of insured commercial property.  While these articles refer to flooding, which presumably includes river flooding, nothing in these articles would have put PXRE on notice that river flooding was "unmodeled" in their loss estimation process, or that PXRE was unable to reliably account for its losses where industry-wide loss estimates exceeded $35 billion.

For example, Plaintiff first quotes Paul Newsome, an analyst at A.G. Edwards, as acknowledging, in an August 30, 2005 MarketWatch.com article, that: "Commercial insurers will suffer losses from property damage and business interruption caused by the flooding . . . [.]  [T]his will certainly be a lot more significant piece of the industry's loss than you'd ordinarily get from a hurricane."  (*Id.* ¶ 81 (emphasis omitted).)  Similarly, Plaintiff next quotes a September 2, 2005 article by AFX News Limited, which noted: "With more than 80% of New Orleans under water and no relief in sight, insurance claims could be astronomical."  (*Id.* ¶ 82 (emphasis omitted).)  To state the obvious, these articles only would have alerted PXRE to the fact that the costs incurred by Hurricane Katrina would be greater than the costs incurred from an ordinary hurricane, and offered no insight whatsoever with respect to the specific alleged problems with PXRE's loss estimation process.

Third, Plaintiff cites a September 2, 2005 *London Times* article that reported that:

> [M]any insurers offer cover against flooding of commercial buildings, leaving them open to what are expected to be huge claims from the New Orleans hospitality industry . . . .  U.S. insurers such as ACE, AIG, Chubb and St. Paul Travelers have been identified by analysts as potentially facing large payouts

---

[37]  The Court also notes that, examining Plaintiff's factual allegations collectively, the relevance of Defendants' failure to adopt RMS's higher industry-wide loss estimates is questionable.  Plaintiff alleges that PXRE's loss modeling system was "unreliable once loss estimates [arising from a storm] exceeded $35 billion," which "effectively capped PXRE's estimate of industry losses at the $35 billion range."  (PSAC ¶ 44.)  It follows from this allegation that adopting RMS's higher industry-wide loss estimates of $40 billion to $60 billion would have made no difference with respect to PXRE's own (erroneous) loss calculations.  *Cf. In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d at 446 n.83 ("Courts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations.").

because of their focus on commercial cover.

(*Id.* ¶ 83 (alterations in original).)  In addition to the fact that this article only reports that insurers who offer coverage against flooding of commercial buildings should expect "huge" claims, when examined in full, it also contradicts Plaintiff's claim that Defendants were reckless in issuing PXRE's initial loss estimates by relying on projected industry-wide losses in the range of $30 billion to $40 billion.[38]   Specifically, a section of the September 2, 2005 *London Times* article not quoted in Plaintiff's PSAC reported that:

> Hurricane Katrina is expected to cause the largest insured loss for a single event, more than the $21 billion paid out following the September 11, 2001 terrorist attacks.   The Insurance Information Institute, a US insurance industry body, estimated that the hurricane could have caused as much as $25 billion of damage to property.

(Anderson Supplemental Aff. Ex. A at 1 (the September 2, 2005 *London Times* Article); *see* PSAC ¶ 83 (quoting the September 2, 2005 *London Times* Article).)

Fourth, Plaintiff quotes a November 14, 2005 article from A.M. Best Company, Inc. Bestwire, which attributed the following statement to Ted Larsen, president of catastrophe modeler Eqecat, Inc:

> "What really changed in Katrina was the flooding of downtown New Orleans which triggered a lot of commercial flood," said Larsen, adding "that flood exposures were omitted from models because the insurance industry had little interest in such a product.   We've had a flood model for a while with limited interest from clients.   We see a whole lot of interest now."

(PSAC ¶ 84 (emphasis omitted).)  Notably, this article was published on November 14, 2005, which is weeks after the date of Defendants' last allegedly false or misleading statement.   Further, the article pertains only to "flood models."  Plaintiff does not allege that Defendants lacked a *flood model*; Plaintiff alleges that Defendants lacked a model that could take into account *river flooding*.  (*See, e.g.*, Oral Argument at 40 ("[Plaintiff] allege[s] that [Defendants] had certainly adequate provision for handling ocean flooding, but river flooding was a new item, and that's what caused all the damage in New Orleans.  That's what caused all [of PXRE's] significant exposure, and that's what [PXRE] failed to publicly account for.").)  This article fails to speak to this point.

In sum, these articles fail to raise an inference that Defendants were on notice that they lacked the capacity to calculate losses due to *river* flooding, or that they lacked the capacity to reliably calculate PXRE losses where industry-wide loss estimates exceeded $35 billion.   At most, these articles support the inference that Defendants were on notice that Hurricane Katrina resulted in unprecedented damage, and that, as of the dates of these articles' publication, the full extent of such damages in monetary terms was not yet ascertainable.   Accordingly, the Court finds that these publicly available articles fail to support an inference of

---

[38]  The Court takes judicial notice of the entirety of the September 2, 2005 *London Times* article on the ground that it is partially quoted in the PSAC, and "integral" to the claims set forth therein.  *See supra* note 9.

fraudulent intent.  *Cf. In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) ("Numerous courts have suggested or assumed that the contradictory information must have been non-public in order to raise a strong inference of intent.    That the information was publicly available when the allegedly misleading statements were made weakens any inference that defendants intended to defraud the market." (internal citation omitted)).

### (5)  The Timing of Modin's Departure and Hengesbaugh's Negotiation of a "Golden Parachute"

Plaintiff alleges that, on December 22, 2005, individual Defendant Modin "announced that he was leaving the Company to 'pursue other interests.'"   (PSAC ¶ 100 (quoting Modin).)    The resignation was effective in January 2006.  (*Id.*)

Plaintiff further alleges that in "late 2005," individual Defendant Hengesbaugh negotiated a "golden parachute."  (*Id.* ¶ 99.) This "parachute" provided that, "[i]f PXRE's rating fell below the critical A- level, Hengesbaugh would be entitled to receive a severance package that could be exercised within 90 days of such a downgrade," which would include: "a) a cash payment equal to twice his annual salary of $425,000; b) a cash payment equal to any housing or automobile allowance provided by the Company; and c) continued participation for Hengesbaugh and his dependents in the Company's benefits program."  (*Id.*)  "The contract was negotiated prior to the end of 2005, but not signed until January 16, 2006."  (*Id.*)  Plaintiff alleges that "[t]he negotiation of this package was not disclosed to the public."  (*Id.*)

Plaintiff argues that the timing of Modin's departure and Hengesbaugh's negotiation of a "golden parachute" support an inference of scienter.  (*See* Pl.'s Mem. at 19-20.)  As just discussed, Modin announced his departure on December 22, 2005 (PSAC ¶ 100), and Hengesbaugh negotiated his "golden parachute" in "late 2005" (*id.* ¶ 99).  In an attempt to connect these actions — both of which occurred after the date of the last challenged statement — to the alleged fraud, Plaintiff alleges that Hengesbaugh "saw the handwriting on the wall" (*id.* ¶ 99),  and that Modin "realiz[ed] that the ship was inexorably sinking" (*id.* ¶ 100).  Beyond these conclusory allegations, Plaintiff alleges no facts, other than the ones already discussed concerning Matusiak, that raise an inference that either Hengesbaugh or Modin actually knew about the flaws in PXRE's loss estimates, or that Hengesbaugh's negotiation of a "golden parachute" or Modin's resignation was in any way linked to the alleged flaws in PXRE's estimation of its loss estimate reports.

Without additional factual allegations linking Modin's resignation or Hengesbaugh's negotiation of a "golden parachute" to the alleged fraud, the Court finds these allegations insufficient to raise a strong inference of scienter.  *See In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007) ("Plaintiffs also assert that at the end of the Class Period, [the Senior Independent Non-Executive Director] resigned after being in the position just three weeks.  However, the [complaint] does not state any facts to indicate that his departure was a result of any knowledge of alleged fraudulent activities at DRD." (internal quotations and citation omitted)); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-447 (S.D.N.Y. 2005) ("Plaintiffs, however, have

alleged no facts linking the resignation of [two of the individual defendants] to the accounting improprieties at BISYS. In reality, there are any number of reasons that an executive might resign, most of which are not related to fraud. . . . Accordingly, absent any alleged facts linking the two resignations and the alleged fraud, the resignations . . . do not support an inference of conscious misbehavior or recklessness." (citations omitted)); *Abbad v. Amman*, 285 F. Supp. 2d 411, 419 (S.D.N.Y. 2003) ("Here, bonus compensation was offered to these defendants to induce them to stay with the company and complete a restructuring. Such restructuring or retention bonuses are common in financially troubled companies."); *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (noting that "the successive resignations of key officials . . . is more likely probative only of the fact that the company was failing").

### (6) The Magnitude of PXRE's Understatement

Finally, Plaintiff points to the magnitude of PXRE's understatement of its loss estimates as being indicative of Defendants' scienter, alleging that Defendants were "off by 80%." (Pl.'s Mem. at 20.) While certainly a relevant factor, it is well established that "the size of the fraud alone does not create an inference of scienter." *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003). It is, of course, also relevant that

"[t]he 2005 hurricane season, which included both Katrina and Rita, caused an unprecedented amount of damage." *Coronel*, 2009 WL 174656, at *27. Indeed, the understatement of *initial* loss *estimates* by PXRE in the wake of Hurricanes Katrina, Rita, and Wilma is not neatly analogized to a corporation understating losses in the regular course of its business, as in the cases cited by Plaintiff. *See, e.g.*, *Rothman*, 220 F.3d at 92 (involving a corporation's 84% write-off of royalty advances); *see also* Oral Argument at 45 (conceding that *Rothman* "involved the ordinary course of business for [that] particular compan[y]"). Accordingly, given the circumstances, the understatement of PXRE's loss estimates fails to support a "strong" inference of scienter.

### b. Plaintiff's Collective Allegations

For ease of analysis, the Court has discussed Plaintiff's factual allegations individually. However, as noted, the Court is mindful that in considering whether the requisite "strong" inference of scienter may be drawn from Plaintiff's factual allegations, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509 (emphasis in original). So considering, the Court finds that Plaintiff has failed to plead that Defendants were reckless in not knowing about the flaws in PXRE's calculation of its loss estimates.

Taken collectively, Plaintiff's factual allegations suggest an industry, and a company, shocked by a unique and devastating catastrophe. The unknown but obviously high costs that would be incurred by Hurricane Katrina were reported by several

newspaper articles. Newspaper articles and leading firms differed as to the full extent of these costs. These varying opinions were all publicly available. PXRE followed the industry-wide loss estimates promulgated by two of the loss estimate firms, attempted to calculate its own loss estimates with its extant software and "ground up" contract-by-contract analysis, and issued a steady stream of press releases revealing its updated calculations to the public. Plaintiff does not allege that Defendants had access to any information specifically informing them of the flaws in PXRE's loss estimation process. Rather, Plaintiff points to the behavior of PXRE's "peer firms" in adopting higher industry-wide loss estimates. However, by the date of Defendants' last allegedly misleading statement, seven out of the eleven of PXRE's "peer" firms referenced by Plaintiff in the chart still appeared to rely on the same lower industry-wide estimates as PXRE.[39]   Further, although PXRE's Chief

Actuary Matusiak expressed "concerns" with PXRE's loss estimates and eventually resigned, Matusiak only allegedly expressed those "concerns" to CI #2, and there is no allegation that CI #2 conveyed Matusiak's "concerns" to anyone else at PXRE. Even if the Court were to infer that the individual Defendants were aware of Matusiak's "concerns," for the reasons already stated, the Court does not find that such an awareness constitutes recklessness for purposes of securities fraud, especially when considered in light of Defendants' reliance on its loss calculation processes, and on the industry-wide loss estimates promulgated by two out of the three firms publicly referenced in the Form 10-Q.   And as discussed, Plaintiff's allegations that Modin resigned in December, and that Hengesbaugh negotiated a "golden parachute" in "late 2005," fail to posit any factual connection between these acts and PXRE's alleged fraud. Viewing all of these facts collectively, what remains is the size of PXRE's eventual disclosure, a fact that by itself, and especially when considered in light of the historic nature of the disaster presented by Hurricanes Katrina, Rita, and Wilma, does not support the requisite "strong" inference of scienter.

In sum, the Court finds that the vast majority of the factual allegations contained in Plaintiff's PSAC suffer from a similar defect. Merely alleging facts suggesting that Defendants knew that river flooding was causing extensive damage in New Orleans does not raise the inference that Defendants knew, or were reckless in not knowing, that Defendants' internal methods and proprietary software all failed to adequately account for river flooding. In fact, *nothing* that Plaintiff

---

[39] If there is *negligence* to be found on PXRE's part, it is in the Company's failure to update its loss estimates between mid-November and February. There is arguably an inference to be drawn that, if in fact all of PXRE's "peers" had updated their loss estimates to rely on RMS's higher industry-wide loss projections by mid-November, then PXRE was negligent in failing to realize that its loss estimates were erroneous due to its continued reliance on lower industry-wide loss projections. Still, the Court finds that the alleged behavior of peer companies here does not suffice to plead recklessness. Even assuming that PXRE was simply the *worst* reinsurance company at estimating losses from Hurricane Katrina, this fact, taken in conjunction with Plaintiff's other factual allegations, fails to raise the requisite "strong" inference of scienter under the conscious misbehavior or recklessness prong. Recklessness requires more than alleging that Defendants were the worst; it requires alleging that the misleading nature of Defendants' loss estimates "was either known to the [D]efendants or so obvious that the [D]efendants must have been aware of it." *Novak*, 216 F.3d at 308 (internal quotation marks and citations omitted). For the reasons stated, the Court finds that

Plaintiff has failed to plead facts that meet this standard.

alleges raises an inference that Defendants had access to information specifically informing them of the flaws that allegedly existed in PXRE's loss estimation process: that is, the failure to account for *river* flooding, and the inability to reliably calculate PXRE's exposure where industry-wide losses exceeded $35 billion. Further, the Court finds that the facts to which Defendants allegedly *did* have access — the various newspaper articles, RMS's higher loss estimates, the behavior of PXRE's peers, and Matusiak's "concerns" — fail to raise the inference that the errors inherent in Defendants' calculation of their initial loss estimate reports were "so obvious that [they] must have been aware of it." *Novak*, 216 F.3d at 308 (internal quotation marks and citations omitted). Accordingly, the Court cannot find that Defendants were reckless in relying on PXRE's loss estimates in promulgating the challenged statements.[40]

Thus, while Plaintiff's PSAC might suggest that "[D]efendants should have been more alert and more skeptical, . . . nothing alleged indicates that management was promoting a fraud." *Shields*, 25 F.3d at 1129;

---

[40] The Court also declines to find that Defendants were reckless in failing to *disclose* various facts, most prominently PXRE's alleged inability to calculate properly the full extent of losses incurred by Hurricanes Katrina, Rita, and Wilma — allegations found in the PSAC but not extensively argued in Plaintiff's motion papers. (*See, e.g.*, PSAC ¶¶ 4, 5, 51 (alleging a failure to disclose, *inter alia*, that Defendants' loss estimates failed to calculate river flooding and was incapable of accurately modeling industry losses exceeding $35 billion). The Court finds that any failures to disclose were not reckless for essentially the same reasons that Defendants were not reckless in issuing the challenged statements, and that likewise, any such failures are at most an indicia of negligence, not of recklessness. *See also supra* note 32 (finding that Defendants were not reckless in failing to disclose Matusiak's "concerns").

*Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001) (noting that "even an 'egregious' failure to gather information will not establish 10b-5 liability as long as the defendants did not 'deliberately shut their eyes to the facts'" (citation omitted)). The Court thus holds that Plaintiff's allegations fail to adequately plead scienter to commit securities fraud under the Second Circuit's "conscious misbehavior and recklessness" prong.

### ii. Plaintiff's Purported Inference of Scienter Fails under *Tellabs*

The Court further finds that, as with Plaintiff's purported inference of scienter under the "motive and opportunity" prong, a reasonable person would not deem Plaintiff's purported inference of scienter under the "conscious misbehavior or recklessness" prong to be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. It follows naturally from the Court's analysis above that the Court deems the more compelling inference to be that, rather than knowing or being reckless in not knowing that PXRE's loss estimates were flawed, Defendants were, at most, negligent in issuing the challenged statements. The Court thus finds that the more compelling inference to be drawn from the alleged facts is that Defendants, in an unprecedented and uncertain situation, simply lacked the software and internal mechanisms to calculate accurately the full extent of losses incurred by the three hurricanes that devastated the Gulf Coast in 2005, and that, as a result, Defendants issued the challenged statements in good faith, but based upon ultimately erroneous loss estimations. The Court accordingly concludes that Plaintiff's purported inference of scienter is not

sufficiently "strong" for purposes of the PSLRA, as it is not "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510.

### C. Section 20(a) Claim

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order to establish a *prima facie* case of liability under section 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks and citation omitted). Since the Court has held that there is no primary violation under section 10(b) of the Exchange Act, Defendants' motion to dismiss the section 20(a) claim is granted. *Cf. In re Centerline Holdings Co. Sec. Litig.*, No. 08 Civ. 505 (SAS), 2009 WL 86850, at *6 (S.D.N.Y. Jan 12, 2009) ("Because Lead Plaintiff's Section 10(b) claims have been dismissed and Lead

Plaintiff has alleged no other primary violation of the securities laws against the Individual Defendants, Lead Plaintiff's Section 20(a) claims are also dismissed.").

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion to amend is denied, and Defendants' motions to dismiss are granted. In light of the fact that the PSAC constitutes Plaintiff's fourth attempt at pleading this matter, the dismissal is with prejudice. Accordingly, the motions located at docket numbers 37, 43, and 51 shall be terminated. The Clerk of Court shall enter judgment accordingly and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 4, 2009
     New York, New York

\* \* \*

Lead Plaintiff Chad S. Condra is represented in this matter by Jeremy Alan Lieberman and Marc Ian Gross, Pomerantz Haudek Block Grossman & Gross LLP, 100 Park Avenue, 26th Floor, New York, New York 10017. Defendant PXRE Group Ltd. is represented by Bruce Domenick Angiolillo, John Cummings Anderson, and Jonathan K. Youngwood, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017.   Defendant Jeffrey L. Radke is represented by David Spencer Karp, Debevoise & Plimpton LLP, 919 Third

Avenue, New York, New York 10022 and
Jonathan Rosser Tuttle, Debevoise &
Plimpton LLP, 555 13th Street, N.W.,
Washington, DC 20004. Defendant John M.
Modin is represented by Justin Matthew
Garbaccio and M. William Munno, Seward &
Kissel LLP, One Battery Park Plaza, New
York, New York 10004. Defendant Guy
Hengesbaugh is represented by Brad Scott
Karp and Jonathan Hillel Hurwitz, Paul,
Weiss, Rifkind, Wharton & Garrison LLP,
1285 Avenue of the Americas, New York,
New York 10019.